MORRIS, administrator, *v.* DUNAWAY.

No. 9295. APRIL 14, 1933.

*John W. Bale,* for plaintiff in error.

*M. B. Eubanks,* contra.

BECK, P. J. L. H. Dunaway, of Floyd County, died intestate on May 22, 1931, leaving three children, viz., Belle Dunaway, Jewell L. Dunaway, and Earl Dunaway, the last named, at the time of his

father's death, and since November, 1929, having been confined as a lunatic in the State Sanitarium. The intestate left a small amount of personal property and the real estate which is the subject-matter of this litigation. After the death of her father, Belle Dunaway and Jewell L. Dunaway filed in the court of ordinary their petition to have letters of administration issue to Charles W. Morris; and after the usual citation, letters of administration were so issued. Morris qualified as administrator, took charge of the estate, had it appraised, obtained an order for leave to sell the land for distribution among the heirs, and advertised the land for sale on the first Tuesday in October, 1931. Three days before the sale was to occur, Belle Dunaway filed a claim to the land and subsequently filed an equitable petition in support of her claim. To this petition Morris filed a general and special demurrer. Upon the hearing the judge sustained the demurrer in part and struck the second paragraph of the petition (as to the question of adverse possession), but overruled the other grounds of demurrer. To this ruling exceptions pendente lite were taken. Issue was joined on the claim, and after introduction of testimony the judge directed a verdict for the claimant and in favor of specific performance, as prayed by her. The administrator made a motion for a new trial, which was denied, and to that judgment he excepted.

In the petition filed in aid of her claim Belle Dunaway alleged in substance as follows: The property described is the right and property of claimant, and the administrator has no right to sell it. During the six or seven years before his death L. H. Dunaway gave to each of his two sons approximately $1200 in cash, this being what he thought would be their pro rata share of his estate, and being more than the value of the property now claimed; and he gave nothing to the claimant. About two years before his death he bought the property claimed, and contracted and agreed with petitioner, who was then of full age and entitled to her own earnings, that if she would remain at home with him and her mother and wait upon and care for them during the remainder of their lives, he would improve this property by repairing and adding to the house and making it a comfortable home, and would leave it to claimant by will at his death; and she agreed to this, accepted the contract, and carried it out in full. Not long thereafter her father and mother both failed in health, and both remained in this condi-

tion for months and until each of them died, first the mother and then the father. In pursuance of her agreement she waited upon and nursed them for months, did all of their housework, cooking, and much of the household drudgery, giving up all opportunities for employment whereby she might earn money, and all social matters, in order that she might be with her parents in their last days, and relying upon her father making a will conveying the property to her. Her father was sick for a long time, and was distressed by reason of the death of his wife. He failed to carry out his part of the agreement as to the making of a will, but he did improve the property as agreed. The property is fully described in the petition. Petitioner (claimant) having performed all of the services contemplated and required of her under the contract, and the father having died seized and possessed of the land in question which was to be devised to her, there being no debts, she is entitled to specific performance of the contract, and to have the property conveyed to her by the administrator free from any and all claims of other persons. Having fulfilled her part of the contract, and the decedent having failed to perform his part, the property so claimed became, in the hands of her father during the remainder of his life, impressed with a trust in her favor, which trust she is now entitled to have enforced against his estate. She prays that her claim be allowed; that she have specific performance of the contract to make a will as to all the property described; and that the court by decree declare that it is her property, and that the administrator be required to convey it to her as fully as could her father in his lifetime.

The petition was demurred to upon the ground that it is insufficient in law; that no legal verdict and decree can be based thereon; that it is vague, indefinite, and uncertain, in that it is not ascertainable whether the claimant is basing her claim upon a parol gift, adverse possession, or specific performance of a contract; that the allegations in several indicated paragraphs are uncertain and indefinite, and do not put the defendant on notice as to the contentions of the plaintiff, there being no allegation as to when the services were performed, of what they consisted, and what was their value; and that there is no allegation as to the value of the land claimed.

■■ The court did not err in overruling the demurrer. The petition sets forth a cause of action, and is based upon an alleged

contract between the daughter and the father that he would make a will leaving the property referred to to his daughter. It is not necessary for the pleader, in a case like this, to set forth specifically the services rendered. The services were of such a character that an itemized statement of them could not be expected or required. She alleged, that, in pursuance of her agreement set forth above, she waited on and cared for her parents and nursed them for months, did all the housework, etc., gave up all opportunities for employment whereby she might earn money, and all social matters, in order that she might be with her parents in their last days. A more definite description of the services than that given here is not required. It would be as impossible to state in dollars and cents the value of these services as it is to set forth the particulars of the various acts of service performed. The petition set forth a cause of action, and was good as against a general demurrer. In *Landrum* v. *Rivers,* 148 *Ga.* 774 (98 S. E. 477), it was held: "Specific performance of a contract to make a will in favor of another, where the party claiming the right to specific performance has performed his part of the contract, will be decreed where the contract to make the will is shown with the requisite degree of certainty and definiteness." See also *Suber* v. *Black,* 168 *Ga.* 439, 441 (148 S. E. 81). As we have pointed out, the contract was sufficiently definite as to the character of the services rendered; and the court did not err in overruling the special demurrer based on the contention that the allegations were vague, indefinite, and uncertain as to the character of the services. This ruling applies also to the demurrer on the ground that the value of the services is not sufficiently set forth.

■ In the motion for new trial error is assigned on the ruling of the court admitting testimony of J. L. Dunaway, as follows: "The piece of property in question would not be worth twelve hundred dollars; the market value would not be twelve hundred dollars in my opinion." The fact that there was no allegation as to the value of the property did not render this testimony altogether irrelevant or incompetent, as it would in some measure show the relative value of the services of the claimant and the property which her father had agreed to leave her in his will, and show that the contract was not an unconscionable bargain on the part of the daughter, and that the land was not worth more than the amount given

by the father in his lifetime to each of the claimant's brothers, according to the testimony of one of them.

■ The ruling in the 4th headnote need not be elaborated.

■ The defendant assigns error upon the direction of the verdict by the court. Upon a careful consideration of all the evidence, we are of the opinion that the court committed error in directing the verdict, and that there were issues of fact made under the evidence which should have been submitted to the jury for their determination. It is undoubtedly true that the evidence in the record preponderates very strongly in favor of the defendant in error. J. L. Dunaway, the son of L. H. Dunaway, the decedent, testified, in part, as follows: "My sister resided with the family, and my brother Earl resided in Atlanta. I owed my father eleven hundred and fifty or twelve hundred dollars, and in 1925 he gave us back our notes and canceled all indebtedness. He did not give my sister, the claimant, anything. I was present in 1925 when an agreement was made between my father and my sister in reference to the property he might have when he died. It was a verbal contract. The circumstances that brought about the agreement were that in 1919 my sister was engaged to be married, and prepared to leave home; and my father and mother persuaded my sister to remain on at home with them, saying they would leave her whatever property they had at the time of their death if she wouldn't leave; that they would leave it to her by will; and in 1925 this agreement was reaffirmed, the fact that she had complied with her agreement. The old property on the Summerville road had not been sold then. They both said if she remained there and cared for them as she had been doing, they would leave her whatever property they had. My mother made a will. I heard that later discussed in 1929. Previously to that time my father sold the old place on the Summerville road, and when he was going to buy the place where he died he told my sister that if she would stay on he would leave her that place. . . My mother was an invalid some two or three years before her death, and was almost an invalid some ten or twelve years prior to her death. From 1919, and before, she had not been able to do her work. After this agreement was made, my sister did the house work, the drudgery of the home, and acted as nurse and companion for both my father and my mother, and such services as a loving daughter would perform for a parent. During

the two years before my mother died she was in bed practically all the time, and my sister nursed and waited on her. She did not attempt and could not get any gainful employment under the circumstances. As to social affairs, she could not have any, remaining at home with her mother and father. They did not have any other nurse. After my mother died she remained at home. My father lived only a few months less than a year after the death of my mother. During that time he was in a semi-helpless condition, unable to work; he had been sick several months previously to my mother's death, and gradually became worse. We never found any will made by him at all. My older brother, Earl, is now in the State Sanitarium. The piece of property in question would not be worth twelve hundred dollars, the market value would not be twelve hundred dollars, in my opinion. My sister did all the household work, such as making beds, cooking, most of the laundry, just the usual order of things a woman has to do. She did not do very much milking; she cared for the milk. In the way of nursing, she administered medicine to mother, dressed her, and did all of that from the time she became a semi-invalid until her death, which was about eight, ten, or twelve years. As to father, she performed the same services, preparing his meals and caring for him as she had her mother. She performed these services both day and night when they were required, and she was frequently so engaged, particularly with my sister; there was hardly a night she didn't sit up with my mother and sister practically all of the time. I know all of these services were performed. I was in the house and saw her do it. I don't think you could place a value on such services; but if my father had hired a nurse to perform them, it would amount to double the value of the place."

H. E. Cockrill testified, in part: "I knew L. H. Dunaway during his lifetime, lived in two or three hundred yards of him. I have frequently talked with him. . . He said that he had helped his boy Jewell and had helped the other son, Earl, and that all he had he was going to leave to her, Belle, and gave as his reason that she had practically sacrificed her life to take care of her mother. He told me that he had bought the place in controversy and wanted to fix up the home up there for her after he was gone. He told me that more than once. He said he ought to make a will, and I told him he ought to. I never heard Earl say anything about any agree-

ment. As to estimating the services Miss Belle rendered, the services were more valuable than the property.

Mrs. James Staten testified that the decedent said he had bought the property in question, and Belle had always stayed at home and taken care of his wife and him, "and he was fixing that place up for her for her home, said he was going to leave it for her. I am not related to them in any way. He just told me he was fixing it up for Belle for a home, wanted to leave her a home."

Miss Bertie Wooten testified: "I had a conversation with Mr. L. H. Dunaway several times during his lifetime, in reference to his daughter and the property he would leave. I don't know what year it was; it was while he was building the new home where he died. He just said that he was leaving, wanted to leave that to Belle. Said she stayed at home and they couldn't have got along without her, and said they had agreed that she stay with them, and he wanted her to have the property he was leaving. He did not say how he was going to leave it to her, just said he was leaving that up there for her, and was wanting to build another house on the place, so she could have some income." Testimony of other witnesses directly corroborated that of the witnesses quoted.

The administrator introduced W. S. Evans, who testified as follows: "I am a notary public and ex-officio justice of the peace of Floyd County, Georgia, and was on the 13th day of April, 1931. The deed which you hand me was executed in my presence. At the time this deed was executed, another deed presented, to the property now in dispute. Mr. L. H. Dunaway did not sign this second deed; he said he intended giving it to Belle, but that his son Jewell had been there for something over a year, and he thought he ought to divide and give him some of it. He said he had agreed to give that to Belle, and that Jewell had been there over a year, and he thought he had better give him some of it."

C. F. Dunaway testified, in part, that L. H. Dunaway, the decedent, was his brother; that he lived about a quarter of a mile from him; that the decedent discussed his affairs with witness very frequently, every time he was with him. "He told me that he had told Belle once that if she would quit quarreling about moving up to the place where he died, she could have it, but that Belle said she wouldn't have it, and that he had given her a home up in Chattooga County that her mother had willed to her. . . He told me,

I reckon, a dozen times that he thought Belle had enough, the home he had given her in Chattooga County and the six-hundred-dollar note. He said that the last week he lived. He was· at my house, and said he had studied a heap about his son Earl and his children; that he hadn't made a will, and that he began to think that he would make a will but was not able to get to town; that he did not like the justice of the peace that lived in our district, and kept putting it off from day to day. He told me what he had already given Belle. He never said as to what disposition he was going to make of the place where he then lived. He said that Jewell drew up a deed to the place where he then lived, and tried to get him to sign it, and that he flatly refused to sign it, that it was not right, and that he had made no disposition of it whatever. I was not at his house the night he died."

The defendant testified: "I am administrator of the estate of L. H. Dunaway. Prior to the filing of this claim by Miss Belle Dunaway to the property now in litigation, I do not recall that she ever made any claim to me for the property. If she did, I would have remembered it."

It will be seen, upon reading it, that the testimony in favor of the claimant is very strong and direct; and the testimony showing an agreement on the part of the decedent to leave the property in controversy to his daughter Belle is not directly controverted by any of the testimony given by witnesses for the administrator. Nevertheless, in view of the nature of the case, we think that the jury should have been permitted to determine the question whether the contract set up in the petition by the claimant had been established or not. This is a suit for specific performance, brought by one who asserts that the decedent had agreed in his lifetime to bequeath to her the property described; and she brings direct testimony of several witnesses to establish her claim relative to the contract, and there are only certain sayings of the decedent and some slight circumstances to make an issue of fact with the direct testimony given by the claimant's witnesses. But, slight as the testimony offered by the plaintiff in error was, and strong as that of the claimant was, we think the whole of the testimony should have been submitted to the jury for their scrutiny and their pronouncement. As was said by Mr. Justice Lumpkin in *Lansdell* v. *Lansdell,* 144 *Ga.* 571 (87 S. E. 782): "Claims of this nature against dead men's

estates, resting entirely in parol, based largely upon loose declarations, presented generally years after the services in question were rendered, and when the lips of the party principally interested are closed in death, require the closest and most careful scrutiny to prevent injustice being done." If evidence making an issue is presented must be scrutinized, the scrutiny must be by the jury. We do not think that the mere fact that two or three witnesses have sworn directly and positively that the owner of the property, sometime during his life, promised to make a will leaving his property to one of his children, his daughter, in consideration of services rendered by the daughter to her father and mother, and the proofs that she did render such services as are frequently rendered by daughters without pay, where living with their parents, requires a finding that the father did make the contract alleged by the daughter to bequeath to her his property. We think that the evidence in a case like this must be very closely scrutinized, and that the court should have submitted the issue involved under the evidence to the jury for their determination.

*Judgment reversed. All the Justices concur, except Russell, C. J., who dissents.*