Argued October 31, affirmed December 20, 1949

TIGGLEBECK *v.* RUSSELL ET AL.

213 P. (2d) 156

*Frank S. Senn,* of Portland, and *Blaine Hallock,* of Baker, argued the cause for appellants. On the brief were Senn, Recken & Recken, of Portland, and Hallock, Donald, Banta & Silven, of Baker.

*George T. Cochran,* of La Grande, argued the cause for respondent. On the brief were Cochran & Eberhard, of La Grande.

Before Lusk, Chief Justice, and Brand, Bailey, Hay and Page, Justices.

### HAY, J.

This is a suit for relief in the nature of specific enforcement of an oral contract to devise and bequeath property in consideration of the performance of personal services by the promisee for the promisor. It seeks to have certain real and personal properties and moneys, comprising the estate of Imogen Elinore Rus-

sell, deceased, impressed with a trust in the hands of the defendants in favor of plaintiff, Marie Tiggelbeck. The defendant Erma D. Russell is the administratrix of the estate of said decedent, and the other defendants are decedent's heirs at law.

For brevity, we adopt the language of the parties themselves, and refer to decedent as "Imogen" and to the plaintiff as "Marie".

The complaint alleges that Imogen died on June 4, 1947; that she left an estate in Union County, Oregon, of the appraised value of some $30,000; that, in her lifetime, she and Marie were teachers in the La Grande public schools, and had formed "a mutual and sisterly love and affection for each other"; that neither had any close companionship with her relatives; that, from 1924 until 1942, Marie was a roomer and boarder at Imogen's home; that, in the latter year, Marie contemplated resigning from her teaching position and leaving La Grande to seek employment in some war industry, where she could secure higher wages; that, by reason of the love and affection existing between Marie and Imogen, such contemplated move on the part of Marie greatly disturbed Imogen, and, after much negotiation, an oral contract was entered into between them whereby, in consideration of their mutual promises, it was mutually agreed between them that Marie would abandon her intention of resigning from her teaching position; that she and Imogen would continue to teach, and, at the proper time, retire together from such work; that they would live and associate together as companions in love and affection as sisters, sharing the privileges and responsibilities of a home; that they would give mutual aid and assistance to each other, and divide equally their ordinary expenses of living,

using the property of Imogen in which to live, with rent of ten dollars a month to be paid by Marie to Imogen, which sum was considered as being one-half of such rent chargeable to both parties; that each of them would make a will leaving all of her property to the other; that Marie fully performed said contract on her part (alleging the acts constituting such performance in considerable detail); that each of the contracting parties made her will in favor of the other, but that such wills did not comply with the requirements of the Oregon statute of wills, and were, therefore, invalid; that, at the time of Imogen's death, Marie was living in Imogen's home and was in possession thereof; that, by reason of Imogen's will being inoperative, said contract has been breached; that Marie has no plain, speedy or adequate remedy at law for such breach, and is entitled to have said contract specifically performed.

The heirs at law and the administratrix, appearing separately, answered the complaint by general denial.

The court, after a hearing, on February 15, 1949, entered its decree in favor of plaintiff, in accordance with the prayer of her complaint. The defendants have appealed.

The evidence discloses that Marie came to La Grande as a school teacher in the year 1923, and, in 1924, became a roomer and boarder in the home of Imogen's parents, in which home Imogen resided. Imogen's father died in 1931 and her mother in 1934. Upon the death of her mother, Imogen acquired a life estate in the Russell home property, which she occupied thereafter until her own death. Imogen was thrifty and industrious, and, with the assistance of a cook-housekeeper, she kept roomers and boarders from the time of her mother's death until July, 1942. At that

time her cook-housekeeper left her employ, and she was unable to find another. She thereupon quit taking boarders but continued taking roomers.

At about that time, Marie was planning to abandon her teaching career and take up some form of war-production work. During Marie's eighteen years' residence as a roomer and boarder in the Russell home, she and Imogen had become greatly attached to each other. Imogen was much disturbed at the thought of Marie's leaving, and told a number of friends that she did not know how she would get along without her. Marie thus describes the formation of the alleged contract in suit:

"A. Well, Ella [the cook-housekeeper] had been with us since 1934, seven or eight years; and naturally Imogen was quite upset about Ella's going, and it affected her greatly, and after she left why she just didn't want me to leave; and I know we discussed it—'Well,' she said, 'Marie, don't leave me. I have no one. I don't know what I'll do if you go.' Q. In discussing that, state whether or not you and Imogen arrived at an agreement? A. Yes, we came to this understanding, and— Q. Just a minute. What was the conversation that was given between you and her, relative to that agreement, and when did it take place? A. Relative to the agreement? Q. Yes. A. Well, I can't recall the exact words. I know when Ella left we discussed the situation, and I wanted to go, leave La Grande, but she had roomers, and of course Ella—We had roomers and boarders, and Ella did the cooking, and she couldn't; she couldn't get another housekeeper. She said she didn't want another housekeeper; and anyway, couldn't get a housekeeper at that time. They 'most all went into war work. That was relative to the understanding, to the— Q. Yes; what did she say to you relative to an understanding? A. Well, she said, 'Marie, if you stay

here and help me, I will leave you all my property. I will leave you everything I have.' I think those were her words. Q. When did that occur? A. That must have been—It was after Ella left. It was the first part of August; sometime in the first part of August. Q. Where? A. It was in the—at the breakfast table. Q. Who was present? A. Just Imogen and I were present. Q. What did you say to her in answer to that? A. Well, I said, 'Imogen, I just don't know.' I said I would just have to think it over, about giving up war work. Of course I hated to leave here [her] too, because she was so upset about Ella, and she really had no one to turn to. She had no one there to really help her, and didn't want to be left alone. Q. Did you give consideration to that offer of hers? A. Yes, I thought about it. Q. Afterwards, what did you tell her? A. I told her, 'Imogen, I will stay here and help you.' I just said, 'After all, I know that you have no one; and I know you don't want to be left alone.' Q. And what other propositions were made relative to your making a will? A. What was that, please? Q. What other propositions were made, relative to your making a will? A. Well, we discussed that a little later. It wasn't at that meeting at the breakfast table. We talked about our war bonds, and co-signing them, and we did; and I talked to her, and said, 'Well, I'll leave you what I have.' And she said she would make out a will; and I made out a will later.''

Up to that time, Marie had been paying $30 a month for room and board. Thereafter, she paid only $10 a month for room rent, and she and Imogen divided the household expenses between them. Marie did most of the cooking and housework. She was about ten years younger than Imogen, and the latter was devoting most of her spare time to planning and constructing improvements both to the Russell home property, in which she had only a life estate, and to other property,

of which she owned the fee. It is evident that the two ladies lived together as a family. They purchased war bonds in their joint names, with right of survivorship, and each attempted to make a will in favor of the other. There is no question but that a very sisterly affection grew up between them, and that they were happy in their association.

Our inquiry must be devoted to whether or not the existence of the alleged contract, and the due performance thereof, have been established by evidence of the character which the law requires in such cases.

■ A considerable body of case law has accumulated in Oregon in respect of cases of oral contracts to devise or bequeath property in consideration of personal services to be performed by the promisee. Such contracts are lawful, and, when the existence thereof and breach by the promisor are properly established in evidence, and no adequate remedy is available at law, courts of equity will grant relief. *Kelley v. Devin*, 65 Or. 211, 132 P. 535; *Woods v. Dunn*, 81 Or. 457, 159 P. 1158; *Popejoy v. Boynton*, 112 Or. 646, 229 P. 370, 230 P. 1016; *Traver v. Naylor*, 126 Or. 193, 268 P. 75; *Vandiver v. Stone*, 149 Or. 426, 41 P. 2d 247; *Stever v. Holt*, 164 Or. 195, 100 P. 2d 1016; *Hunter v. Allen*, 174 Or. 261, 147 P. 2d 213, 148 P. 2d 936; *Benson v. Williams*, 174 Or. 404, 143 P. 2d 477, 149 P. 2d 549.

> "There can be no doubt but that a person may make a valid agreement binding himself legally to make a particular disposition of his property by last will and testament. The law permits a man to dispose of his own property at his pleasure, and no good reason can be assigned why he may not make a legal agreement to dispose of his property to a particular individual, or for a particular purpose, as well by will as by a conveyance to be made at some

specified future period or upon the happening of some future event. It may be unwise for a man, in this way, to embarrass himself as to the final disposition of his property, but he is the disposer, by law, of his own fortune, and the sole and best judge as to the time and manner of disposing of it. A court of equity will decree the specific performance of such an agreement upon the recognised principles by which it is governed in the exercise of this branch of its jurisdiction. In the case of *Rivers against The Executors of Rivers* (3 *Dessau. Rep.* 195) the court, in sustaining the propriety of a court of equity's recognising and enforcing such an agreement, very properly remarked, that a man might renounce every power, benefit, or right which the laws give him, and he will be bound by his agreement to do so, provided the agreement be entered into fairly, without surprise, imposition, or fraud, and that it be reasonable and moral." *Johnson v. Hubbell* (1855) 10 N. J. Eq. 332, 335, 66 Am. Dec. 773.

■ Relief in the nature of specific performance in such cases is not a matter of right. It is granted only in the exercise of sound judicial discretion. *Harris v. Craven,* 162 Or. 1, 19, 91 P. 2d 320. The policy of the law, in "requiring all contracts touching lands to be reduced to writing", is so wise and salutary that exceptions to the rule ought to be rare and their allowance hedged about with every reasonable safeguard. Cf. *Brown v. Lord,* 7 Or. 302, 309. Nevertheless, to deny relief in a proper case would, in effect, permit the use of the statute of frauds as a cloak for fraud. *Mathews v. Tobias,* 101 Or. 605, 610, 201 P. 199; *Stephens v. Tipton,* 128 Or. 115, 119, 268 P. 1014.

■ A contract of the sort under consideration is within the statute, and is invalid and unenforcible unless performed sufficiently to take it without its scope.

Sections 2-905 and 2-909 (6), O. C. L. A.; *Brown v. Lord,* supra (7 Or. 302) ; *Wagonblast v. Whitney,* 12 Or. 83, 6 P. 399; *Roberts v. Templeton,* 48 Or. 65, 80 P. 481, 3 L.R.A. (N.S.) 790; *Tonseth v. Larsen,* 69 Or. 387, 138 P. 1080; *Le Vee v. Le Vee,* 93 Or. 370, 181 P. 351, 183 P. 773.

The writing drawn and signed by the promisor reads as follows:

"June 22, 1944

"To whom it may concern:

"Everything that I own, I leave to my friend, Marie Tiggelbeck.

"[Sgd.] Imogen Russell."

This instrument, not having been witnessed as the statute requires, was not valid as a will under our law. Sections 18-201 and 2-903, O. C. L. A.; *Montague v. Schieffelin,* 46 Or. 413, 80 P. 654.

In *Herr v. McAllister,* 92 Or. 581, 181 P. 741, plaintiff sought to enforce an alleged oral contract with the owner of certain land, whereby she claimed that she agreed to look after such owner, take care of his house, and make a home for him during the remainder of his life, in consideration whereof he agreed to and did give her the property. She performed her part, but he failed to carry out his. It was shown that the promisor had made a will disposing of all his property except that covered by the oral agreement, and that subsequently he caused a codicil to his will to be prepared, devising the last mentioned property to plaintiff. The codicil was not produced at the hearing and the opinion does not state that it was ever actually executed. This court held that the alleged contract had not been proved, and, in any event, that plaintiff had been fully com-

pensated for her services. It was commented that there was no evidence other than plaintiff's testimony to establish the contract, the implication being that the preparation of the codicil devising the property to plaintiff was of no evidentiary effect. As the court held that plaintiff had been compensated for her services, its comment that the contract had not been proved was unnecessary to the decision. The general rule is that, if there is evidence tending to show the existence of a contract, proof of the execution of a will containing a devise or bequest in favor of one who has performed services for the testator is corroborative proof of the contract. *Maddox v. Rowe,* 23 Ga. 431, 68 Am. Dec., 535; *Hiatt v. Williams,* 72 Mo. 214, 37 Am. Rep. 438. The rule has been applied, although afterward the will was rendered ineffectual by being destroyed by the testator. *Naylor v. Shelton,* 102 Ark. 30, 143 S. W. 117, Ann. Cas. 1914A 394. And it is immaterial that the will is invalid because of lack of the required statutory number of witnesses. *Maddox v. Rowe,* supra, (23 Ga. 431, 68 Am. Dec. 535). See 57 Am. Jur., Wills, section 187; Anno., 69 A. L. R. 202; 106 A. L. R. 765.

In this connection, it is argued that Imogen's will in this case is in exactly the same status as the unsigned will of Mrs. Hunter in *Hunter v. Allen,* supra (174 Or. 261, 276-7, 147 P. 2d 213, 148 P. 2d 936), which indicated nothing more than testamentary intentions on the part of the intended testator toward the intended beneficiary. In the Hunter case, however, all of the actions of the alleged promisee were referable to his partnership relationship, and whatever inference might have been drawn from the unsigned will was overcome by the testimony of the person who drew it as to Mrs.

Hunter's statements to him of her reasons for making her son the chief beneficiary of her estate. There was no evidence whatever, other than the testimony of the plaintiff, in unequivocal proof of the alleged contract to devise. The two cases are quite dissimilar.

Counsel comment that it is rather strange that Marie and Imogen, both school teachers of more than twenty years' experience, were not aware that the law required wills to be witnessed. They imply that the fact must have been otherwise, and suggest that the circumstances cast some doubt upon the seriousness of the parties' intentions—we presume they mean the parties' intentions in executing unwitnessed wills. We find nothing at all strange or unusual in the circumstances. A great many professional people are surprisingly unsophisticated in respect of matters of general knowledge outside their own special field.

■ The contract must be fair, reasonable, and just in its terms, and must be proved by clear, concise, convincing and satisfactory evidence. *Magness v. Magness,* 148 Or. 44, 33 P. 2d 1005; *Losey v. O'Hair,* 160 Or. 63, 83 P. 2d 493; *Harris v. Craven,* supra (162 Or. 1, 91 P. 2d 302); *Brennen v. Derby,* 124 Or. 574, 265 P. 425; Annotations: 69 A.L.R. 14; 101 A.L.R. 923; 106 A.L.R. 742. Moreover, strict performance by the promisee must be established. *Losey v. O'Hair,* supra (160 Or. 63, 83 P. 2d 493); *Mathews v. Tobias,* supra (101 Or. 605, 201 P. 199); *Shepherd v. Allingham,* 132 Or. 684, 288 P. 210; *Magness v. Magness,* supra (148 Or. 44, 33 P. 2d 1005); *Hunter v. Allen,* supra (174 Or. 261, 147 P. 2d 213, 148 P. 2d 936); *Benson v. Williams,* supra (174 Or. 404, 143 P. 2d 477, 149 P. 2d 549). The rendition of the services must have been wholly referable to the contract and solely predicated thereon, and the

services must have been of such a character, and of such peculiar value to the promisor, as not to be estimated or compensable by any pecuniary standard. *Brennen v. Derby, supra* (124 Or. 574, 265 P. 425); *Vandiver v. Stone, supra* (149 Or. 426, 41 P. 2d 247); *Woods v. Dunn, supra* (81 Or. 457, 159 P. 1158); *Traver v. Naylor, supra* (126 Or. 193, 268 P. 75); *Losey v. O'Hair, supra* (160 Or. 63, 83 P. 2d 493); *Hunter v. Allen, supra.*

Counsel for appellants, in their brief, say:

"* * * Now these services which the plaintiff claims she rendered to the deceased by reason of this contract were not unique. They were the same she had always rendered. They were in the nature of *companionship and social relationships, relationships that are found in every home throughout the land. * * *"* (Italics supplied.)

■■ The services were, of course, not unique. They consisted, as has been stated, of the giving of society, companionship, and affection, things the value of which is not susceptible of pecuniary estimate. These things are, we think, of the nature of the "companionship and social relationships * * * found in every home", of which counsel speak. The fact that in the present case the promisee was not of the promisor's kindred neither lessens the value of the services nor tends to defeat the claim. Anno., 106 A.L.R. 763-4; *Vandiver v. Stone, supra* (149 Or. 426, 41 P. 2d 247); *Traver v. Naylor, supra* (126 Or. 193, 268 P. 75).

While this court has held that, under Oregon law, it is not technically necessary that there should be evidence in corroboration of the plaintiff's own testimony with reference to the making of the contract in such cases (*Harris v. Craven, supra*, 162 Or. 1, 19,

91 P. 2d 302), nevertheless we have indicated that for equity to compel specific performance of an alleged contract to devise real property "proved unequivocally only by the testimony of the claimant" would work a virtual abrogation of the statute of frauds. *Hunter v. Allen,* supra (174 Or. 261, 281, 147 P. 2d 213, 148 P. 2d 936). We proceed to consider, therefore, what evidence of corroboration was received in this case.

Mrs. Thelma Drake Burnham, a teacher at La Grande from 1939 to 1942, who roomed and boarded at the Russell home and was well acquainted with both ladies, testified that, when the war began, she was looking for an opportunity to go down toward Portland, and importuned Marie to accompany her.

"I do remember this, every time Marie would mention the possibility of going away, quitting her job there, Imogen would say to me well, she didn't know how she would get along without Marie. One time she said to me, 'Thelma, don't urge Marie, don't urge Marie. I couldn't get along without her.' * * * She had mentioned—I can't give the exact words because it has been so long—that when she was gone, because of the cooperation they had, the love and affection they had for each other, that the things she had were to be Marie's. * * * Q. Now then I will ask you this: during your discussions there between you three, Imogen, Marie and you, do you remember what was said about the time Marie was contemplating going out to war work there, what Imogen said to Marie about her staying with her and what she would do for her? A. Well, she told her that if she didn't leave, that the things she had would be her's, in other words, she intended to leave everything she had to her, and I think that was the thing that deterred Marie from leaving. * * * I asked Imogen one night at the table, 'When you die would you leave me that

teapot?' and she said, 'You will have to talk to Marie about that. These things will all be hers.' "

Telling of a conversation that she and her mother had with Imogen and Marie, while visiting at the former's summer cabin at Wallowa Lake, in 1946, the witness said:

"The thing was, I was still hoping Marie might come down and try to find something down here. [The witness testified by deposition, taken in Portland.] I thought it was better than for her staying in La Grande, and the matter of her leaving brought up this remark—let's see if I can think how it was stated—that there was an agreement between them. She said, 'There is no possibility of my leaving now.' She said, 'We have made an agreement I will stay.' * * * Q. Now then, during this conversation when you talked about that there was an agreement between them, did Imogen say anything about her leaving her property to Marie? * * * A. She mentioned that she was leaving everything to Marie, that Marie was her family, that she had no other family really, that everything she had would go to Marie when she was gone."

Mrs. T. Francis Drake, Mrs. Burnham's mother, testified in reference to the Wallowa Lake incident mentioned above:

"* * * Mr. Drake, Thelma and I and the little daughter went up there. [Marie and Imogen were present.] * * * And I said, 'Do you plan to have boarders again when you retire?' She had all these teachers in her home at the time Thelma was up there, and she said, 'No, I think it is too much work, and you know Marie will still be teaching some years and I will be renting apartments, all I can manage.' Then I said, 'Isn't it nice you are such good friends, you and Marie, it is so lovely for you,' and she said, 'I don't know what I would do without Marie, I couldn't get along without her, and I am so glad

I persuaded her to stay on here instead of leaving during the war.' Q. What did she say she was going to do for her because she was staying with her? * * * A. The substance was that she had persuaded Marie to stay with her, and made it worth her while. That was the substance of it, all this work they had done together, they would reap the benefits of it together. * * * and she said, 'Marie is my whole family now,' something to that effect. That was the general idea through it all, you always had the feeling that she and Marie were just the family strictly, so much closer than just friends. * * * "

Mrs. Clarence Kopp, wife of the Rector of the church which both Imogen and Marie attended and a friend of both for about sixteen years, testified with reference to a conversation which she had with Imogen in May, 1947:

"It is hard to remember just word for word, but I do remember that I was talking about my children, and she spoke of Marie as her 'child', as she always did, and she said: 'I am leaving everything that I have, to Marie.' * * * "

Minnie Holmann, a close friend of both ladies and a former schoolmate of Imogen's, testified with respect to a conversation with Imogen which took place on the day before the latter left La Grande on the motor trip during which she was accidentally killed:

"Q. And did you observe the relationship existing between Marie and Imogen? * * * A. Well, many times I thought that that relationship was closer than two sisters, that they seemed to depend on each other, that they were very very congenial, and that they seemed to get along well together. Q. * * * Did you ever have a conversation with Imogen * * * concerning how she was going to dispose of her property? * * * A. On the day

before she left on her trip, we were on a picnic, and Imogen and I were resting and talking, and Imogen * * * said to me * * * 'You know, Marie has meant more to me than my own sister; and I am leaving my property to Marie.' "

Mrs. Laura Whitcomb, who had been acquainted with both Imogen and Marie for over three years, and had rented an apartment from the former, testified:

"Q. Did you ever have any conversation with Imogen? A. Oh, yes. Q. Concerning her relations with Miss Tiggelbeck? A. Well, the one time that she said more than any other, I rode out into the country with her not long before she went east, and we were just discussing relatives and—oh—different situations that arise; and she said, well, that Marie had done for her, and meant more to her than any of her family."

Jean Emmett, a casual business acquaintance of Imogen's, testified regarding a conversation which she had with Imogen in the fall of 1946:

"She said she intended to leave all her property to Miss Tiggelbeck, because she had been closer to her than anyone in the world; if she had a child it couldn't be any closer to her than Marie."

Mrs. Lucile Crowther, a young matron who had known both Marie and Imogen all her life, told of a conversation had with the latter in the fall of 1946:

"A. I don't know how it come up. * * * I had come down to see Imogen about something. We were standing in the dining room at the table, and she said she wanted me and mother to witness her will that she had made. Then she went on to say that she was leaving everything to Marie, because that Marie was closer to her than her own sister, that they had always lived there and shared everything. It was the first I had heard of Marie's ill health, that she had wanted to quit teaching and go

into war work, and she told me about this agreement she mentioned. Q. What did she say about the agreement? A. That she intended to leave everything to Marie, and Marie was leaving everything to her. That is the way she put it to me. Q. What did she say about their living together? A. That they had lived together for twenty-three years, * * * that they had shared everything, and been really closer than sisters. Q. And what was they going to do in the future? A. Just go on living together. She didn't give me any details, except they planned to go on living together. * * * ''

In respect of the legal requisites as to certainty, the contract should be so precise in its terms that neither party could reasonably misunderstand them. *Brown v. Lord,* supra (7 Or. 302). The contract here was sufficiently certain as to the property promised to be devised and bequeathed; it was to be ''all my property. I will leave you everything I have.'' We have held this to be a sufficient description in such cases, under the maxim, that is certain which may be made certain. *Popejoy v. Boynton,* supra (112 Or. 646, 653, 229 P. 370, 230 P. 1016); *Rose v. Oliver,* 32 Or. 447, 454, 52 P. 176. It is necessary, of course, that there should be a valuable consideration for the contract before it can be specifically enforced. This is found, in our opinion, in the description of the services which the promisee agreed to perform. Imogen's offer, in effect, was: ''Don't leave me. I have no one. If you stay here and help me, I will leave you all my property. I will leave you everything I have.'' Marie's response, in effect, was: ''I will stay here and help you. After all, I know that you have no one, and I know you don't want to be left alone.'' This constituted the simple original agreement. Sometime later, some details were agreed upon, and the contract was

modified by the arrangement for the making of mutual wills.

In *Woods v. Dunn,* supra (81 Or. 457, 467, 159 P. 1158), the consideration for a promised devise was the furnishing of a home for the promisor and taking care of him, in sickness or in health, during his natural life. This was held to be a sufficient consideration. In *Law v. Henry* (1872) 39 Ind. 414, the court held that where a daughter, with her husband, broke up her home and moved a considerable distance in order to reside near her father, that he might enjoy her society and companionship, this was a sufficient consideration to support an agreement by the father to give her certain land. In *Morris v. Dunaway* (1933) 176 Ga. 881, 169 S. E. 129, an agreement by the promisee, a woman of full age, that she would remain at home with her father and mother and wait upon and care for them during the remainder of their lives, was held to state a sufficient consideration for the father's promise to devise certain property to the promisee.

It is proper, in this connection, to take into consideration the background of the relationship of the parties, in the instant case, and the circumstances under which the contract was made. They lived in the same household for some eighteen years, for about half of that time sharing the same room. They were members of the same profession, of the same church, and of the same lodge, and had been constant companions and intimate friends. Between two persons so situated, there could have been no doubt regarding the meaning of the obligation of the one to stay with the other and help her, as she had no one. Plainly, it meant and was understood to mean that the promisee was to stay with the promisor as companion and helper, in a quasi-

family relationship, and so remain during the lifetime of the promisor.

Counsel insists that the evidence fails to show an agreement to make mutual wills. Imogen's will, of course, is in evidence. Immediately following her testimony regarding the making of the original agreement, Marie testified as follows:

"Q. And what other propositions were made, relative to your making a will? * * * A. Well, we discussed that a little later. It wasn't at that meeting at the breakfast table. We talked about our war bonds, and co-signing them, and we did; and I talked to her, and said, 'Well, I'll leave you what I have.' And she said she would make out a will; and I made out a will later. Q. And when did you make out a will? A. It was in '43. Q. Did you ever show that will to Imogen? A. No, I didn't. Q. And did you ever see Imogen's will? A. No, I never did. Q. What did she say relative to having made a will? A. Well, she told me several times she had made a will, and then the Saturday that she left— You mean to go East? Q. Yes. * * * A. On the Saturday she left on her trip east, she told me, 'Now, Marie, if anything happens to me, my will is in my bank box.' And I said, 'Oh, well, don't talk like that. Nothing will happen to you.' * * * Q. Now then, you say you also made a will? A. Yes, I did. Q. And what did you—How did you make it? A. I wrote it in my own handwriting, on paper—what I later learned was a holographic will. It was not witnessed. Q. Not witnessed? A. No; it was just like Imogen's. Q. What did you do with that will? A. I destroyed it. Q. Why? A. Naturally, when they threw out Imogen's will,—I had willed my property to Imogen, and when they threw out her will, I didn't think mine was of any value. I destroyed it. Q. In that will you had willed everything to Imogen? A. I did. Q. When did you destroy it? A. I destroyed it after I moved into

the little cottage. That must have been in July, sometime, of '47, I burned it in the fireplace there. * * * Q. Now, state whether or not you have fully performed all the terms of that contract between you and Imogen, with regard to the leaving of the property to each other? A. Yes, I have. Our understanding, I was to stay there, and I did; and I helped her. * * * "

On cross-examination, she testified:

"Q. But you did consult with Mr. Eberhard; and did you tell him about this making of this will? * * * A. Later on, when we discussed the case. Q. When did you discuss it? A. A number of weeks later. He was in Portland when I first talked to him over the telephone about it. * * * Q. Now, Miss Tiggelbeck, when you went and saw Mr. Eberhard, you told him about this will, didn't you? A. No, I didn't tell him about any will. Imogen had told me Saturday, the day she left—she says, 'If anything happens my will is in the bank box.' I never saw the will, the original will, until he showed it to me on the witness stand. I never had seen the will. I just saw a photostatic copy of it. Mr. Eberhard showed me that, and the only time; I knew the will was there. Ruth [one of the defendants] told me they had found this will in the bank box. * * * Q. Ruth then told you about this writing? A. She did, yes; about this will; she said it would not hold water in court, I remember. Q. And you told her there was another one? A. I never said one word. Q. About Mr. Oliver had made one? A. No, I never said that to her. * * * Q. Where was your will at the time you went to Mr. Eberhard? A. I had it in my purse, in my billfold. Q. Where did you keep it before? A. In my purse, in my billfold. * * * Q. You claim you didn't show it to him at that time? A. No, I didn't. I never even thought about my will. * * * Q. Then you moved in the house, you say, about the first of July? A. That is right. Q. How soon afterwards was it

that you burned this will? A. I don't know exactly. I was going through some things I had, and I destroyed a lot of things, and I was looking through the papers there and I destroyed my will when I destroyed some other things. I burned it in the fireplace. I would judge it was about a week or so. \* \* \* Q. And you moved in the house on the first day of July, '47? A. That is right. Q. And you think it was a week or so afterwards that you burned this will? A. That is right. \* \* \* ''

■ ■ Marie's will having been destroyed, secondary evidence of its contents was, of course, admissible. The fact that it was executed in attempted performance of the contract is evidence tending to prove the contract. Page on Wills, 3d ed., section 1753, text and note 13; *Taylor v. Wait,* 140 Or. 680, 14 P. 2d 283. And this is true, even if the will, because not properly executed, is of no effect (Page, op. cit., section 1753, text and note 14), or if it is revoked by a later will (*In re Burke's Estate,* 66 Or. 252, 134 P. 11), or by burning or other form of destruction. Page, op. cit., section 1753, text and notes 15, 16.

■ We think that the agreement to make mutual wills was sufficiently established. The fact that Marie, after learning that a holographic will was invalid in Oregon, destroyed her's, was explained to the satisfaction of the trial judge. We see no reason for doubting her testimony. She resided in La Grande and held a teaching position there for a quarter of a century. From that fact, and from the testimony of disinterested witnesses living in that community, it is evident that she is held in high regard there. In our opinion, the circumstances of her destruction of her will were such as to free her from suspicion of intentional fraud, neglect, or default, and to overcome the unfavorable presump-

tion which the wilful destruction of documentary evidence would otherwise have raised against her. *Booher v. Brown,* 173 Or. 464, 474, 146 P. 2d 71.

It is contended that, in the case of an agreement to make mutual wills, if the will executed by one party is invalid the whole consideration fails as to the other party, because, in that event, he has nothing for his promise. To uphold such contention, counsel cite only a lone sentence from 69 C. J., Wills, section 2723, p. 1301: ''The consideration for mutual wills fails where one of them is invalid or ineffectually executed.'' The only case cited in support of this text is *Martin v. Helms,* 319 Ill. 281, 149 N. E. 770.

That was a case in which it was sought to have admitted to probate a document which purported to be the joint and mutual will of a husband and wife. The husband's signature was duly witnessed by two witnesses, but the wife's only by one. It was held that, the will being invalid as to the wife, it was invalid as to the husband also. Since the husband executed the will in consideration of the wife's promise to execute it, and she failed to keep her promise, the consideration for the husband's promise failed.

It is obvious that that case is not in point here. There was no failure here, as there, of the sole consideration for the making of the mutual wills. Neither party in this case made a valid will, but Marie fully performed all the rest of the consideration on her part. It is true that Imogen (if her own failure had not estopped her) might have elected to treat Marie's failure to make a valid will in her favor as a breach of contract, but she did not do so, and, after her death, her heirs cannot rely upon such breach. Page on Wills, 3d ed., section 1725, text and note 9; *Kelley v. Devin,*

supra (65 Or. 211, 218, 132 P. 535). Imogen's death without having made a valid will was a breach of contract. Page, op. cit., section 1726, text and note 2. But Marie could have performed her contract by making a valid will at any time during Imogen's lifetime. Ibid; *Lewis v. Siegman,* 135 Or. 660, 665, 296 P. 51, 297 P. 1118. In our opinion, the point that Marie's failure to make a valid will caused the consideration for the making of a valid will by Imogen to fail, is untenable under the facts in this case.

After careful consideration, we have concluded that the making of the contract was sufficiently proved. In arriving at such conclusion, we have not only weighed the evidence with caution, but have also taken into consideration the convincing quality of some of the supporting testimony. *Holter v. Laugen,* 157 Minn. 90, 195 N. W. 639. It is true that the testimony of some of the supporting witnesses tended to indicate that Imogen's intentions toward Marie were testamentary, but the testimony of Mrs. Burnham, in particular, shows clearly that Imogen recognized her contractual obligation. *O'Connor v. Waters,* 88 Neb. 224, 129 N. W. 261, 262. The fact that Marie, in Imogen's presence, told Mrs. Burnham that she had made an agreement to stay with Imogen, is to be regarded as somewhat in her favor. *Harris v. Craven,* supra, (162 Or. 1, 23, 91 P. 2d 320) ; *Losey v. O'Hair,* supra (160 Or. 63, 75, 83 P. 2d 493.)

Counsel criticize Mrs. Burnham as a prejudiced witness, very obviously biased in favor of Marie and against Mrs. Cox, Imogen's sister. They say that, in view of the witness' bias and Marie's counsel's habit of asking leading questions, one would naturally expect "something really worth while in the way of corrob-

oration'' from this witness. They proceed to argue, however, that she produced nothing worthwhile in that regard. Mrs. Burnham, it will be recalled, lived at Imogen's home for three years. Their relations were very cordial. She testified that Imogen had told her on numerous occasions that her relationship with her family was not close. In fact, the witness thought they caused her more grief than anything else. Imogen took Bob Cox (her nephew) and kept him at her home, and he was a problem and a trial the whole time he was there. If Mrs. Cox ever came there, she would just come through the house and say something and go right out again. There was no sisterly affection; it was just a case of coming down to visit, and the witness didn't believe Mrs. Cox was there more than three times while the witness was there.

There was evidence, to the contrary, that the relationship between Imogen and the family was friendly. Imogen was very friendly with her brother Ralph, who died in 1945. Robert W. Cox (Bob) testified that he lived with Imogen while he attended Junior College at La Grande in 1941-1942. He did not get along too well with Mrs. Cliff (Mrs. Burnham) while there, but got along quite well with Marie and with Imogen. He did not stay there after June, 1942. Mrs. Ruth Cox testified that her relations with her sister Imogen were always very friendly, that she saw her as frequently as possible, and that they were never estranged in any way. The witness lived at Boise, Idaho, and was not able to go to La Grande very often.

 While it is apparent that Mrs. Burnham was a friendly witness toward Marie and a person of rather strong sympathies and antipathies, we cannot say that the evidence shows sufficient prejudice or bias on her

part to impair her credit as a witness. The trial judge, who observed her attitude and demeanor upon the witness-stand, was in a better position than we to evaluate her testimony.

Respecting the equity of the relief which plaintiff seeks, it is to be observed that Imogen, at the time of entering into the contract, was a maiden lady of nearly sixty years of age. Her only near relatives were a sister, two nieces and two nephews. They did not live in La Grande. The evidence is that her relations with them were quite friendly. Mrs. Hannah W. Knowles, widow of the late Judge John W. Knowles, former Circuit Judge of the Tenth Judicial District, was a witness for defendants. Mrs. Knowles had lived in La Grande for fifty-four years, and was an intimate friend and, for years, a neighbor of the Russell family. She testified that Imogen had told her often how much she thought of Ruth (Imogen's sister) and her boys.

> "In our conversations she was always very affectionately speaking very sweet and kind of her family. I didn't know there had ever been anything that wasn't kind and generous about the whole set-up of the family, because she always spoke of her family as Ralph's children [Ralph was Imogen's deceased brother]; and of course I lived right by them when Don was killed—her other brother—and for that reason we always felt very close, talking about our family; and she made the remark that Ruth had two awfully fine boys."

Mrs. Florence Bacon, a resident of La Grande for about fifty-eight years, and a close friend of Imogen's, testified:

> " * * * she mentioned at various times how she was working toward having something built up for her nephews, of whom she was very fond. She spoke

often of Bob and Jack. It might have been she spoke to me because I knew the boys so well; and she told me at different times, 'Oh, I am just having a grand time. There are the boys, we are a pioneer family here, we have been living down in that home for forty years or more. My folks were pioneers; the boys are both real-estate minded, and I would like to have them know me as something else besides a school teacher,—a builder, * * * she spoke of having this property for the boys so that that could be recorded into the town that her folks had lived in. * * * * ''

There is nothing in the circumstances of the case to indicate that Imogen, in contracting to devise and bequeath her property to Marie, was ignoring the claims of dependent relatives. The Russell home property, in which Imogen resided and in which, as has been mentioned, she owned only a life interest, was the object of the greater part of her building activities. She inherited some $15,000 from her mother, and expended most of it in remodelling and repairing the home property. All of this property, at Imogen's death, went to the Russell heirs, defendants herein, who owned the fee. It would seem, therefore, that the contract in suit imposed no hardship or injustice upon any third persons whose interests, in a court of equity, are entitled to prior consideration over those of plaintiff. Cf. *Johnson v. Hubbell,* supra (10 N. J. Eq. 332, 66 Am. Dec. 773); Anno., 69 A. L. R. 67.

██ This court has stated in a number of cases that, before a contract of the sort involved herein will be specifically enforced, it must be mutual in its terms. *Wagonblast v. Whitney,* supra (12 Or. 83, 6 P. 399); *Brennen v. Derby,* supra (124 Or. 574, 265 P. 425); *Losey v. O'Hair,* supra (160 Or. 63, 83 P. 2d 493); *Hunter v. Allen,* supra (174 Or. 261, 286, 147 P. 2d 213,

148 P. 2d 936). It is mutuality of obligation rather than of remedy that is meant. 49 Am. Jur., Specific Performance, section 35, text and note 10; *Rose v. Oliver,* supra (32 Or. 447, 455, 56 P. 176). The rule which required that there must have been mutuality of remedy at the time when the contract was entered into, or the contract will not afterward be specifically enforced, has been repudiated for all practical purposes. *City of Dallas v. Gates,* 133 Or. 300, 308, 289 P. 497; *Temple Enterprises v. Combs,* 164 Or. 133, 154, 100 P. 2d 613, 128 A. L. R. 856, and authorities therein cited. See, generally, Annotations in 65 A. L. R. 45, 69 A. L. R. 73, 101 A. L. R. 952, 106 A. L. R. 751.

It is essential to the granting of the relief prayed for in this case that the contract should have been strictly complied with by the plaintiff. *Mathews v. Tobias,* supra (126 Or. 358, 360, 268 P. 988). The evidence indicates that this condition was fulfilled. The chief matter, of course, was the formation and continuation of the intimate relationship between the parties, an association not easy to be described, but apparent to their friends and acquaintances. Marie herself testified as to this and as to the manner in which she helped Imogen in other respects, in addition to staying with her and giving her affectionate companionship. Some of the testimony corroborative of Marie's follows:

Lucile Crowther:

"Q. Now, in the work around there, what work did Marie do around the house? A. From the time I have been there I would judge she did most of it. Usually Imogen got started on it and got called to the telephone or something. Of course I don't think Imogen was trying to slack. I wouldn't say that. * * * A. Marie did most of the cooking,

and always—I remember Marie always scrubbed the kitchen floor and did most of the cleaning. I have seen both of them running the vacuum and both dusting.''

Mrs. Clarence Kopp:

''A. Marie was never like a servant in the home. She was like a daughter. * * * Q. Now, what did she say about Marie working, doing things for her? A. She—not working for her. She always thought of her as a daughter. They worked together in companionship. I always thought of Marie as her hands, and sometimes wondered if she wasn't head and hands both. * * * A. Well, as we all grow older we depend on our children more and more, and I think it was just meant she called on Marie constantly for everything she needed consultation and help in.''

Mrs. Thelma Drake Burnham:

''Q. Now then, during your time of residence there did you observe the relationship that existed between Miss Tiggelbeck and Miss Russell? A. Well, yes. Q. Just state briefly what that relationship was that you observed as to love and affection. A. They were very close. They were more like sisters than families usually are. What one did, the other one always did, and they were very thoughtful and very kind towards each other and showed affection. Q. And how about dependence upon each other? A. Well, Imogen was the oldest. Naturally, she would be more dependent— * * * A. Imogen was building—she was working toward her retirement and she had this home and she had built one house, I think, at the time and she had another little cabin, another little home that she was building and remodeling the garage, and so forth, and she was not able—I think I ought to put it that way—to do these things by herself. There was too much work with her school teaching, and she depended upon Marie for assistance in her work,

her work there in the home, and Marie went ahead just like part of the family would and helped with painting, with repairing things, and she put in her own money on it. I know that time and again she would repair the sidewalks for Imogen, or the stairs, buy the paint, buy things for the car, because it was their car. * * * A. * * * Marie was, I imagine, ten years or so younger than Imogen and would have that much longer to teach before she retired. Imogen mentioned several times to me that when she retired she was going to go ahead and work on her homes and these houses and have those things for her income and that she had kind of hoped that perhaps some day she and Marie could go into business together. Marie was the bookkeeper, Marie took care of the business end of all these things, and she was the most practical of the two. Q. During those times did Marie contribute anything toward any of these things that were gotten at that time? A. You mean as far as money? Q. Yes, money. A. Oh, yes. As I said, she bought paint, she paid for the repair of the plumbing, she painted the house. Time and again she painted my bedroom and the bathroom, bought the paper for that, did,—well, things that a friend doesn't do. You don't go in and paper somebody else's house because you are a friend. Q. How about furniture, did she contribute toward buying any furniture during that time? A. It seems to me she bought a rug— now, I am not just certain about that, but as far as paying for their rooms, she paid—as I recollect she paid for the entire remodeling of their bathroom,—they had their own little private bath,— she put in everything there, she put in the shower, she put in all the plumbing down there. * * * Q. Now, how were those things used in the home while you were there, the things that Marie bought and the things— A. (interposing) Well, they were used just like it belonged to the family. I don't know what else to say. They were used, whether Marie had bought them,—she just contributed them,—that

was her home, you know. In other words, anything she bought was used right there in the house. * * * Q. Now then, did Imogen tell you what Marie did for her, with regard to the finances and bookkeeping. A. She took care of everything, she took care of the school records, she took care of all the book work, keeping of the book accounts. Every single month that happened; Marie took care of everything for her. In other words, she was the business manager.''

We think that Marie's actions, in staying with Imogen and rendering her sisterly companionship and assisting her in her endeavors and work, are all referable to the contract between them. They were far beyond the acts of a housekeeper who renders services without pay, and who must find her remedy in an action to recover on the quantum meruit. Many of the services, of course, were such as may be included within the duties of a housekeeper, although, observed against the background of the family relationship, they partook more of the character of services usually rendered voluntarily by a member of a family. In our opinion, they were not compensable by a monetary standard.

Counsel say that, where persons, even though un-related, reside together in the same household as part of one family, the customary small services and courtesies performed by one for the other are presumed to be without consideration. That is a correct statement of the general rule (see Anno., 7 A. L. R. 2d 134), but we do not consider that it is applicable to the factual situation here. Until the making of the contract, Imogen and Marie did live in the same house, but as landlady and lodger, not as members of a family. In any event, the presumption may be overcome by evidence of an express contract. *Ibach v. Hoffman*, 184 Or. 296, 198 P. 2d 266, 270.

It is suggested by defendants that *Hunter v. Allen,* supra (174 Or. 261, 282, 147 P. 2d 213, 148 P. 2d 936), disposes of the case contrary to the plaintiff's contentions. In that case, it was claimed that there was a parol contract whereby a mother agreed to devise certain real property to her son in consideration of the rendition by him of certain services. There was, however, a partnership relationship existing between the parties during the period covered by the rendition of the services. The mother had frequently mentioned to third persons that she intended to give the real property to the son as a reward for his having remained with her many years, assisted her in maintaining a home, and managed and operated their livestock business. We held that the evidence was more susceptible to the interpretation that the mother's testamentary intentions with regard to the property were based upon feelings of gratitude rather than upon a contract. Moreover, there was no evidence of the existence of the alleged contract other than the testimony of the son, the claimant thereunder, and his services were more naturally referable to the partnership relationship than to the alleged contract to devise. The case is, therefore, distinguishable on the facts from the case at bar.

Marie asserts that, in reliance upon the contract, she took possession of the property. The evidence will not support such a claim. Imogen continued in possession of her property as much after the formation of the contract as before. Change of possession (usually coupled with the making of valuable improvements) is one of the things which serve to take the contract, in such cases, without the statute of frauds, but it is not essential for that purpose if the evidence dis-

closes the doing of other acts of part performance sufficient to take the oral contract out of the statute. *Holder v. Harris,* 121 Or. 432, 445, 248 P. 145, 253 P. 869, 254 P. 1021.

Statements by and conduct of Marie, claimed to be inconsistent with the existence of a contract to devise, are called to our attention.

For example, Marie loaned money to Imogen from time to time, took promissory notes therefor, and charged interest thereon. These loans amounted in all to a sum in excess of $3,000. The money was borrowed by Imogen for use in connection with her building program, most of which, as has been mentioned, was upon property in which Imogen had only a life interest. Marie filed a claim against Imogen's estate for some of the notes. Counsel say that, in view of the fact that she claimed Imogen's estate under the alleged contract, her filing of a claim upon the notes against the estate was as if she had filed a claim against herself. However, in view of the fact that much of the borrowed money was expended upon property in which Imogen had no more than a life estate, and in respect of which Marie had no rights whatever, and in view of the uncertain outcome of the pending lawsuit to establish the alleged contract, we think that Marie's filing of a claim against the estate for the borrowed moneys was a reasonable precaution for the protection of her own interests.

Another inconsistency was a statement made by Marie to Mrs. Margaret Mellen, in February, 1947, that she thought she would apply for a school in California; that she thought she had been long enough in La Grande. Mrs. Mellen testified to the conversation, but, on cross-examination, she said that Marie didn't

exactly say she was thinking about going to California, but asked Mrs. Mellen if the latter thought she should.

Defendant Erma D. Russell, Imogen's sister-in-law, testified relative to a conversation which she had with Marie, in February, 1945, immediately after the witness' husband, Ralph Russell, died:

> "Q. Just go ahead and tell Judge Watts what Marie said—said to you at that time, concerning the property, and any other conversation immediately relating thereto? * * * A. The reason we had the conversation,—I was a little disturbed because I was left alone with two girls to look after. Marie and I talked, and Marie said, 'Erma, I don't think you should sell the business. I think you should keep it and go ahead and run it yourself, because women are as capable as men; and see what Imogen has done, taken the property inherited and improved it, and in a few years the income would keep her very nicely, and she would have more to leave the family than she got from them.' "

Marie admitted advising Mrs. Russell not to sell the business, and telling her about Imogen's having built up her building program, but denied saying anything about leaving the property to her family. Here, again, it is to be remembered that a considerable part of Imogen's building program was upon the old Russell home property, which, at her death, went to the heirs at law, so that, in that sense, she was leaving the family more than she received from them.

On the whole, the inconsistencies were not, in our opinion, sufficient to overcome the evidence establishing the oral contract to devise.

The testimony of Mrs. Lucile Crowther indicated that, in the fall of 1946, Imogen knew that her will had to be witnessed, in order to be valid. She, therefore,

had an opportunity to make the will valid, but failed to do so, and the implication is she deliberately and intentionally permitted it to remain invalid. Mrs. Crowther's testimony in that connection was hardly strong enough to compel the conclusion that Imogen knew that witnesses to a will were essential. Moreover, the evidence is that, just before leaving on the trip in the course of which she met her death, Imogen reminded Marie that, if anything happened to Imogen, her will was in her bank box. It would seem, therefore, that Imogen even then believed that her will was valid.

The services rendered Imogen by plaintiff were not in the nature of caring for her and nursing her, as is so often the case in contracts of this kind, although, in the nature of things, considering the disparity between the ages of the parties, they might have developed into that sort of services in course of time. In order to fulfill her part of the agreement, Marie changed the course of her life and circumstances, restricted, for so uncertain a period as the duration of the life of the other party, her freedom of movement and of enterprise, and entered into a family or quasi-family relationship in which she performed services of an extraordinary character not capable of measurement by any pecuniary standard. *Popejoy v. Boynton,* supra (112 Or. 646, 654, 229 P. 370, 230 P. 1016).

Every case of this sort must be determined upon its own facts. *Brennen v. Derby,* supra (124 Or. 574, 579, 265 P. 425). The facts in this case, in our opinion, were sufficient to entitle the plaintiff to the equitable relief for which she prayed. The decision of the lower court was right. The decree is affirmed, without costs to any party.