Argued January 6, affirmed January 20, petition for rehearing
denied February 17, 1960

MacINNIS, Adm'x *v.* WILSON et al

348 P. 2d 777

*Lynn Moore,* Springfield, argued the cause and filed a brief for appellants.

*Ralph Hillier,* Eugene, argued the cause for re-

spondent. Husband & Johnson, Eugene, filed a brief for respondent.

Before McALLISTER, Chief Justice, and ROSSMAN, O'CONNELL and HARRIS, Justices.

HARRIS, J. (Pro Tempore)

This is a suit in equity to enforce specifically an oral agreement allegedly made between plaintiff's decedent, Lettie Good,[*] (hereinafter referred to as "Lettie") and defendant Wilson's decedent, Dora Belle Martin (hereinafter referred to as Dora), that Dora would leave to Lettie all her property at the time of her death if Lettie would come to live with Dora for the remainder of her life.

The suit seeks to have certain real and personal property of the approximate value of $18,000, comprising Dora's estate, impressed with a trust in the hands of defendant executor in favor of Lettie. Defendant Maynard Wilson is the executor of Dora's estate, and the other defendants are legatees and devisees under Dora's will; the defendant Alta Bernhardt being the residuary and principal beneficiary under the will. The court entered a decree awarding to Lettie all the distributable property and assets of Dora's estate, excepting certain specific bequests herein mentioned, which were allowed to stand.

All the defendants have appealed. However, since plaintiff has not entered a cross-appeal in regard to the specific bequests, the controversy in this court is really between Lettie's personal representative and

---

[*] The case was originally filed in the name of Lettie Good, plaintiff. Lettie Good died in December, 1958, and subsequently Judith A. MacInnis, Administratrix with Will Annexed of the Estate of Lettie V. Good, was substituted in this court as plaintiff-respondent.

the residuary beneficiary under the will, Alta Bern-hardt.

There is no dispute between the parties concerning applicable law. Such a contract as alleged is lawful. However, it must be proved by clear, concise, convincing and satisfactory evidence. *Tigglebeck v. Russell et al.,* 187 Or 554, 563, 567, 213 P2d 156, and cases therein cited. Moreover, the contract must be fair, reasonable and just in its terms. *Magness v. Magness,* 148 Or 44, 33 P2d 1005. Also strict performance by the promisee must be established. *Losey v. O'Hair,* 160 Or 63, 83 P2d 493. Likewise, the rendition of the services must have been wholly referable to the contract and solely predicated thereon, and the services must have been of such a character and of such peculiar value to the promisor as not to be established or compensable by any pecuniary standard. *Brennen v. Derby et al.,* 124 Or 574, 265 P 425.

Defendant's sole assignment of error is as follows:

"The Court erred in finding and decreeing that a valid contract as alleged by the Plaintiff, except as thereafter modified by the Court, was made and existed at her death between the plaintiff Lettie Good and Dora Belle Martin, deceased, and that the Plaintiff is entitled to specific performance of the contract found by the Court but not alleged by the Plaintiff, and that thereunder Plaintiff is entitled to be the residuary legatee and devisee of the estate of Dora Belle Martin, deceased."

The only question, therefore, to be decided on this appeal is whether the plaintiff has proved the existence of the alleged contract, and performance thereof on her part, by a preponderance of the evidence of a character the law demands in such cases and announced in the foregoing decisions of this court.

In 1942 when Dora's husband passed away, she was 68 years old. She had great concern about living alone. Dora made offers to other relatives to compensate them if they would come and live with her. As a result of one offer, Dora's niece, Margaret Groff, lived with her for about a year after Dora's husband died. When circumstances made it impossible for Margaret to further live with Dora, Dora's brother came and lived with her until he died in 1945. Each of these individuals was promised compensation. The exact nature thereof is in dispute. However, the evidence clearly establishes that Dora had great fear of living alone, and as a result thereof on occasions she would even go to the home of neighbors to sleep. The evidence indicates Dora expressed a belief she would outlive her assets and only a small estate would be available for distribution.

When Dora's brother died in 1945, contact was made with Lettie, who was Dora's niece and who, at the time, had a steady, lucrative position in the hotel industry in California. The evidence discloses Lettie had extensive experience in the hotel industry.

Early in 1946 Lettie resigned her position and moved into Dora's home in Creswell, Oregon, where she remained for 11 years until Dora's death in April, 1957. Lettie swore this resulted from Dora's offer to leave her property to Lettie. After joining Dora, Lettie engaged in substantial employment, and the living expenses and housework were shared by the two women.

The critical period in connection with determining the matter of the contractual relationship, if any, between the two women is that following the death of Dora's brother in 1945. Two disinterested and unimpeached witnesses corroborated Lettie relative to

the alleged agreement. Mrs. Ethel Runyan testified as follows:

"Q  Do you recall any conversations she had with relation to Lettie Good?

"A  She said that if Lettie would come live with her she would do the same for her, the same as she did for Maggie.

"Q  And exactly again, what was that?

"A  She told me that if Maggie would come and live with her and take care of her and be with her the rest of her life that she would leave all of her property to her.

"Q  Now, did she have any reservation about the type of property that she would leave. In other words, was it limited at all to the furniture or to the house?

"A  No.

"Q  The words she used was what?

"A  All of her property. I understood it to mean everything that was left at the time that she passed away.

"Q  And she asked what service of Maggie then?

"A  Just to be with her."

Mrs. Oleta Heaton gave the following testimony:

"Q  Do you know whether Mrs. Martin after Curtis' death made arrangements with anyone to live with her permanently?

"A  Yes, she did.

"Q  Do you know who she made arrangements with?

"A  Well, she called Mrs. Good. She called Mrs. Good, but before she wrote Mrs. Good a letter. And I helped her with it. And she wrote it that afternoon after Mr. Veatch's death.

"Q Now, what do you mean by 'helped her with the letter', will you describe the situation as it occurred?

"A Well, when I went in and told her about Mr. Veatch she wanted me to call Wayne Veatch, which I did, in Los Angeles, because she couldn't hear well over the phone. And his daughter and young Dale in John Day, which I did. And then she started in right away wondering who she could get to stay with her, because she was afraid to stay alone. So I told her that I would stay at the ranch during the day, and then I would stay with her at night until someone got there. And then she said that she was going to write to Lettie in California, and ask her to come and stay with her. And I said, 'Well, why don't you call her?' Because that is what she wanted was to get her there. But she said that she didn't hear well enough over the phone. So she wrote this letter to Lettie that afternoon there at her home.

"Q Now, during the time she was writing the letter you indicate you helped her. Now—

"A Well, I sat right there with her, and she discussed it with me, about asking her to leave her job and come up there; and she said that she would be the only one that she could ask because she was the only one that didn't have a family.

"Q Do you know whether Mrs. Martin told you at the time where Mrs. Good was?

"A Oh, she was, I think, at a hotel in Fresno.

"Q Did Mrs. Martin tell you at the time she was discussing this with you what Mrs. Good was doing?

"A She said she was working in a hotel.

"Q Mrs. Martin knew that she was working?

"A Yes.

"Q Did she discuss with you whether or not Mrs. Martin wanted her to leave this job?

"A Mrs. Martin had wondered whether she would leave the job or not.

"* * * * *

"Q   With regard to the letter that was being written in your presence as you testified, do you know what Mrs. Martin was offering to Mrs. Good?

"A   I didn't read the letter after she finished it. But she told me that if Lettie would give up her job and come up there and stay with her that she would give her whatever she had when she passed away.

"Q   Now, do you know from conversations with Mrs. Martin or did Mrs. Martin tell you exactly what she meant about 'to live with' for instance?

"A   Well, I took it that she didn't want her to keep house for her or anything; she wanted someone with her as a companion, because that way she wouldn't be alone. And I didn't think—Mrs. Martin didn't want anyone to do her housework. She was very capable of doing her own. I think she just wanted someone with her.

"Q   You indicate that she was fearful of staying alone?

"A   Yes, she was.

"Q   Did she indicate that that is why she wanted somebody to stay with her?

"A   Well, yes, that is the reason why she had her brother come there, and the first niece.

"Q   Now, did she indicate what she was referring to when she said 'everything she had left'? Was she limiting that in any way?

"A   No, no, that was just what she said. Whatever she had left, if she lived long enough that there would be anything left. [sic]  She had a fear of that that maybe there wouldn't be anything left. But she said, whatever she had left if Lettie would stay with her until she passed away, that Lettie would get it.

"Q   Do you know what happened to the letter that we are referring to?

"A   Well, I mailed the letter in Cottage Grove on the way back to the ranch, and I don't know

anything about it—I guess she got it because Lettie called her.

"Q And how do you know Lettie called, were you there?

"A Well, Mrs. Martin told me that Lettie had called her and talked to her about it and said that she got the letter."

The trial judge who saw and heard the witnesses seemed impressed by Mrs. Heaton's testimony. In his memorandum opinion he stated:

"The testimony of the plaintiff was corroborated in essential details by the testimony of one Lena [Oleta] Heaton, who is not shown to have any interest in the outcome of this litigation."

So far as indicated by the record, after Dora's brother died the sole relative of hers who was ready, able and willing to spend the remaining years with Dora was Lettie.

It seems improbable that Lettie would have resigned a well-paying position in California, given up her career in hotel work, and changed her entire mode of living simply to have "a roof over her head." We mention this because the evidence indicates the two women shared their living expenses and the housework after Lettie came to live with Dora. It also appears that Lettie, although continuing to support herself after coming to Creswell, was forced to give up certain employment that conflicted with her living arrangements with Dora.

Defendants contend that Lettie did not possess knowledge of Dora's assets in 1946 when she accepted the offer to come to Creswell. However, Lettie knew Dora owned her own home and that she had sufficient property in addition thereto to support herself.

We now come to the execution of the will men-

tioned in earlier paragraphs, which Lettie claimed contravened her agreement with Dora.

For approximately seven years after Lettie's arrival in Creswell, the relationship between the two women was reasonably harmonious. In 1953 Dora broke her arm and thereafter suffered other infirmities of a person of advanced age. Religious differences were likewise the cause of dissension. Relations between the women deteriorated to the extent they generally lived apart, although under the same roof.

Sometime before the execution of the will in question, Dora had executed a deed to the home property in favor of Lettie. This deed was not delivered to Lettie, but was destroyed by Dora shortly before the execution of the will.

In June, 1956, about eight months prior to Dora's passing, she was bedridden in the home of her niece, Alta Bernhardt, in Bremerton, Washington. Mrs. Bernhardt's attorney, James Arthur, of Bremerton, was called and prepared a will for Dora. By virtue of the will, Lettie was given a life estate in the home property and $4,000, payment of which was spread over a period of four years. Dora then provided for small bequests to other relatives and a $500 bequest to her church (these relatives and the church were named defendants below and are appellants here), and the residue of Dora's estate was devised and bequeathed to Alta Bernhardt.

Mr. Arthur, the Bremerton attorney, was called as a witness and originally testified that before he prepared the will in question Dora had stated to him she wanted to change her will. His statement is as follows:

"I recall that she first mentioned to me that

Mr. Wilson was her attorney, that she had mentioned to him that she had wanted to change her will, that she had been unable to do so."

After the court expressed interest in the matter of "changing the will," however, the witness altered his testimony as follows:

"As far as changing a will, I don't recall it was discussed of changing a will. She said she wanted to make a will. And she had talked to Mr. Wilson but which way it was in that discussion I couldn't honestly say."

However, it is significant that the first provision in the will which Attorney Arthur drew for Dora is as follows: "First, I hereby revoke all former wills made by me."

It will be noted that defendants' witness Grace Harris made the following statement in response to a question put to her by the court as follows:

"THE COURT: * * * Do you think that Dora intended—or when she talked to you did she sound like she was going to make a new will, or was she going to make a will for the first time?

"THE WITNESS: Well, she said 'change her will', and I didn't know that she had one made. You know, I didn't know anything about it. And I didn't encourage her to talk about it, because I didn't want to be involved."

Prior to testifying to the foregoing, Mrs. Harris had stated that in 1956, while Dora was in her final illness, she had visited Dora in the hospital. She further swore:

"A * * * I visited her [Dora] most every evening while she was up there. And she said, when Alta comes tomorrow I am going to make her take me to see a lawyer, and I am going to leave Lettie out because she doesn't deserve any-

thing. She was real peeved at Lettie because Lettie hadn't visited her while she was in the hospital.

"Q  Lettie was—

"A  Lettie was ill, and I tried to explain that to her. She said, 'You used to have to leave them fifty cents, but now you don't have to leave them anything.' "

In weighing the evidence and passing on the issues in this case, we believe it is significant that Dora waited until within eight months prior to her passing to execute her last will (or "change her will"), and that this last will was executed at the time, place and under the circumstances and conditions disclosed by the record.

Mr. Arthur, who had been Mrs. Bernhardt's attorney for 12 years, further testified as follows:

"* * * And I explained the type of services that might be allowed. And she said, 'Well, the situation in our home is exactly the opposite;' she said, 'I do all the work and provide all the monies.' And I do remember she made those statements."

We do not believe the statement Mr. Arthur claims Dora made squares with the evidence, which clearly supports the fact that the housework and household expenses were shared equally by the two women.

While the will in question contravened the oral contract entered into between the two women, it is to be noted that the will did contain a devise and bequest in favor of Lettie. This in itself is considered corroborative proof of the alleged contract.

"* * * The general rule is that, if there is evidence tending to show the existence of a contract, proof of the execution of a will containing a devise or bequest in favor of one who has per-

formed services for the testator is corroborative proof of the contract. Maddox v. Rowe, 23 Ga. 431, 68 Am. Dec. 535; Hiatt v. Williams, 72 Mo. 214, 37 Am. Rep. 438." *Tiggelbeck v. Russell et al.,* supra, at p 566, and cases there cited.

■ Defendants complain because the trial court, contrary to the theory alleged by Lettie, allowed certain small specific bequests to other persons, heretofore mentioned, to stand. Defendants claim that the court made a new contract for the parties, and thus attempted to compromise the claim of Lettie and the other legatees by "not only making a contract, but also a will." Since we hold in favor of Lettie relative to the agreement, she is the only one who could complain of the court's ruling in allowing the specific bequests mentioned to stand. Lettie has not crossappealed, and the matter is, therefore, not before us for decision.

Defendants further contend that oral contracts to devise and bequeath are not enforced where services are capable of appraisal or subject to pecuniary estimate, but the promisee shall be left to his remedy at law. However, the services performed by Lettie consisted of the giving of her society and companionship, the value of which things is not susceptible of pecuniary estimate.

In *Tiggelbeck v. Russell et al.,* supra, at p 568, the court held:

"The services were, of course, not unique. They consisted, as has been stated, of the giving of society, companionship, and affection, things the value of which is not susceptible of pecuniary estimate. These things are, we think, of the nature of the 'companionship and social relationships * * * found in every home', of which counsel speak. The fact that in the present case the promisee was not

of the promisor's kindred neither lessens the value of the services nor tends to defeat the claim."

In weighing the testimony and arriving at the conclusions herein reached, we have not overlooked statements in the record that would indicate Dora believed that she owed no legal obligation to Lettie.

From the foregoing we find that the agreement between Dora and Lettie has been proved by a preponderance of the evidence of the character demanded and referred to in the authorities heretofore cited. We also find that Lettie substantially complied with all the terms of the contract on her part to be performed. She lived with Dora for 11 years and relieved her of the great fear she had of being alone. The services Lettie rendered were, in our opinion, wholly referable to the contract and solely predicated thereon, and the services were of such character and of such value to Dora as not to be estimated or compensable by any pecuniary standard. The decree appealed from is, therefore, affirmed, without costs to any party.

Department 1.

Appeal from Circuit Court, Lane County.

ALFRED T. GOODWIN, Judge.

ON APPELLANTS' PETITION FOR REHEARING

Lynn Moore, Springfield, for the petition.

No appearance contra.

Before MCALLISTER, Chief Justice, and ROSSMAN, O'CONNELL and HARRIS, Justices.

HARRIS, J. (Pro Tempore)

It has been brought to our attention by defendants' petition for rehearing that in our opinion we used the phrase "* * * a preponderance of the * * *" (evidence). The use of this term was inadvertent and constitutes surplusage. The phrase is hereby ordered deleted from the two places where it is found in the opinion.

The petition for rehearing is denied.