Argued and submitted February 27, affirmed in part; reversed in part May 27, (1980)

# MUSSELMAN, et al,
## *Respondents, Cross-Appellants,*
### *v.*
# MITCHELL,
## *Appellant, Cross-Respondent,*

### (No. 34129, CA 14813)

611 P2d 675

Robert T. Scott, Albany, argued the cause for appellant, cross-respondent. With him on the brief was Scott & Norman, Albany.

James W. Walton, Corvallis, argued the cause for respondents, cross-appellants. With him on the brief was Ringo, Walton, Eves & Gardner, Corvallis.

Before Schwab, Chief Judge, and Thornton and Campbell, Judges.

THORNTON, J.

## THORNTON, J.

This appeal involves a dispute over the ownership of a joint savings account. The account was established in the defendant savings bank by the decedent, Erin Musselman, in the joint names of herself and her longtime friend, defendant Arlene Mitchell.[1]

The issue arises in the context of a suit filed by the decedent's mother, Anna Musselman, and a sister, for specific performance of an alleged prior existing oral contract by the decedent to will her property to her mother.

The amended complaint alleged that the decedent promised to leave her property to her mother in return for supportive care and a life estate in the house in which the decedent and her mother lived.

The trial court found a contract existed and imposed a constructive trust on the contents of the joint savings account which passed to defendant at decedent's death pursuant to the right of survivorship clause on the signature card of the account. Defendant was awarded $5,000 for her expense in her good faith effort to defend the suit. Defendant Mitchell appeals from that decree. Plaintiffs cross appeal the $5,000 award.

The record shows that the decedent was trained as a nurse and spent the bulk of her nursing career in the Navy. In 1952, while working in a Veterans Administration hospital in Los Angeles, decedent became the supervisor of defendant. The two became good friends. During a recuperation period following surgery, decedent lived at defendant's apartment for several days. In 1955, after a period of separation, the two women shared an apartment in San Francisco, dividing expenses equally. In 1957, decedent began having mental problems and entered the hospital where she was

---

[1] State Savings & Loan Association was named as a defendant in this case as the nominal stakeholder of the joint account funds and is not involved in this appeal. Hereafter, "defendant" refers exclusively to defendant Arlene Mitchell.

[301]

diagnosed as schizophrenic. Eventually, decedent improved to where she could be released on weekends, which she would spend at defendant's apartment. During this period, decedent twice attempted suicide while staying with defendant.

Sometime prior to 1960, decedent was transferred as a patient to a hospital in Washington. Thereafter, the two women saw each other only three times, once between 1962 and 1964, once in 1973 when defendant came to Oregon on a camping trip, and once in 1977 shortly before decedent's death when she flew back to Maryland to visit defendant. The two continued a lengthy and regular correspondence including monthly letters and, toward the end of decedent's life, what became almost weekly telephone calls. Decedent always remembered defendant's birthday and sent gifts at holidays.

Sometime between 1960 and 1962, decedent was released from the mental hospital in Washington into the care of her mother in Corvallis. Decedent's family was hopeful that recovery was possible and, upon consultation with the treating psychiatrist, determined that the best approach would be to make decedent as self-sufficient as possible, particularly since everyone expected that decedent would survive her mother. To this end, she was encouraged to manage her financial affairs to the extent possible. Because of family policy in general and the plan to build decedent's confidence, no one in the family ever inquired into the sources, amounts, investments or other details of decedent's finances. There was no evidence at trial that particularly called into question decedent's capacity to manage her money, and the parties stipulated that one of the doctors who treated decedent late in her life was prepared to testify that she was in fact competent in this regard. It appears that decedent was thrifty and would insist on going to the bank immediately to deposit her checks so as to earn as much interest as possible.

Decedent's mental condition made her very difficult to live with on occasion. She suffered anxiety over small concerns and periods of depression or hallucination. She was constantly on medication. The mother testified that she and decedent managed fairly well but that her daughter's temperament and her frequent need for attention placed severe restrictions on the mother's social life and led the mother to discontinue her part-time occupation selling encyclopedias. Other family members testified that decedent became more antisocial toward the end of her life, particularly after it was discovered she had breast cancer in 1976, from which she died in December, 1977.

The evidence shows that the mother attended to all of decedent's basic needs and paid taxes on the house and most household expenses. Decedent's money went mainly to savings, to medical expenses, and to things she wanted and gifts. The mother testified that she encouraged such savings because she anticipated that decedent would need them if her mother predeceased her. The mother did most of the yardwork. The housework was shared between them, although decedent gradually took over responsibility for much of it.

The agreement in question was never reduced to writing and was the product over the years of numerous family discussions. Mrs. Dannen, decedent's sister, testified that the matter was first discussed during the mid-1960s. (The complaint alleged the agreement was made prior to 1970.) Plaintiffs in their depositions and at trial, formulated the agreement in several ways. At trial, the parties characterized the formation of the agreement as follows: Decedent frequently expressed her gratitude to her mother for all the care she was getting and was aware that otherwise she would be forced to remain in the hospital. When she first moved in with her mother, they lived in a house which was shortly thereafter condemned for urban renewal. They moved to another house which decedent liked very much and stated on many occasions that she never

wanted to leave. An agreement was struck that decedent could continue to reside in the house as long as she lived and would receive supportive care from her mother in return for which decedent promised to leave her property to her mother should decedent predecease her.

The original complaint alleged that the mother agreed to perform care, support and maintenance for decedent during the latter's lifetime in return for which decedent would leave her assets to her mother. In their depositions, both the mother and Mrs. Dannen stated that the agreement did not include housework or support but was simply that decedent would leave her property to the mother if the decedent died first, and *vice versa.* The testimony at trial was consistent with the allegations of the amended complaint.

Anticipating she would die first, the mother, in July, 1973, executed and recorded deeds to certain property she held in Montana and to the house in Corvallis which tranferred ownership to her three children equally. The deed to the house (which was not drawn by an attorney) stated:

> "The true and actual consideration paid for this transfer, stated in terms of dollars is $150.00, encluding [sic] the free rental of ground floor, basement, and garage, to Anna Musselman, and Erin Mae Musselman, as long as she lives, or cares to live their [sic]." ·

Decedent died intestate. In 1975, she created several joint savings accounts with rights of survivorship, including the one at issue here, a time deposit of $23,400 with defendant, and with several of decedent's relatives. No one was aware of or took steps to ascertain the amounts of such deposits. Even after decedent discovered in 1976 that she had cancer, no one inquired as to whether she had made a will disposing of her estate in accordance with the agreement. By way of explanation, plaintiffs again indicated it was family custom not to inquire into the financial affairs of others. All family members who were co-signers of

other accounts renounced all interest in them (with the exception of decedent's nephew, who indicated his willingness to do so.) No one used any of the money in the accounts. Defendant testified that, during their last visit in 1977, decedent had suggested that the funds in the joint account be transferred to defendant's bank in Maryland. This alternative was rejected by defendant because she felt decedent might need the funds for medical bills and they would be more available in Oregon.

Plaintiffs seek relief in the nature of specific performance of decedent's promise under the oral agreement to leave her property to her mother. Such oral contracts are generally enforceable provided the terms are proved by clear and convincing evidence. *Krueger v. Ropp,* 282 Or 473, 478, 579 P2d 847 (1978). The contract must be fair and reasonable in its terms and strict performance by the promisee must be shown.

> " * * * The rendition of the services must have been wholly referable to the contract and solely predicated thereon, and the services must have been of such a character, and of such peculiar value to the promisor, as not to be estimated or compensable by any pecuniary standard. [Citations omitted.]" *Tiggelbeck v. Russell,* 187 Or 554, 567-68, 213 P2d 156 (1949).

*See also, MacInnis v. Wilson,* 220 Or 282, 285, 348 P2d 777 (1960).

Defendant on appeal makes essentially two attacks on the contract in question. First, she argues that the terms of the agreement are so uncertain and the formulations so varied that the evidence falls short of the clear and convincing level required for enforcement and suggests instead that the "agreement" is an afterthought of the family. Second, she contends that, even if a contract is found to exist, the motivation for the mother's services is motherly love and a sense of familial obligation toward decedent and the services are therefore not "wholly referable" to the alleged agreement.

The existence and nature of any agreement must be viewed in light of the circumstances and relationship of the parties. *Tiggelbeck v. Russell, supra,* 187 Or at 574. Where the parties are related to one another, it is not surprising that the agreement is not the product of a distinct bargaining process and was not reduced to writing.

> "* * * It was a natural agreement in the nature of a family settlement, and it should be carried out by the courts, if possible, because such arrangements are favored in equity. * * *" *Kelley v. Devin,* 65 Or 211, 218, 132 P 535 (1913).[2]

*Clark v. Portland Trust Bank,* 221 Or 339, 350, 351 P2d 51 (1960).

The testimony was unanimous at trial that the agreement was that the mother would arrange for decedent to live in the house for decedent's life and would provide supportive care as long as she was able. Unlike many of the cases, no completely disinterested witnesses corroborated the terms of the agreement. On the other hand, the evidence here showed that decedent had strong antisocial tendencies and few, if any, friends with whom she would have discussed the matter. In general, financial matters were not discussed among family members and decedent kept her financial transactions confidential.[3] Defendant offered no evidence (e.g., statements by decedent) which contradicted the making of the agreement. Under the circumstances, the testimony of family members is sufficient.

Moreover, the stated terms of the agreement are borne out by several circumstances. The mother executed a deed in 1973 (before creation of the joint

---

[2] *Kelley* involved a father's promise to his son to devise specific real property to him if his son would remain and work the family farm as a partner. The court found a valid contract and imposed a trust on the land conveyed to a third party under the father's will.

[3] The fact that financial matters were kept confidential and that decedent was encouraged to be self-reliant also explains in large part why no one in the family inquired whether decedent had executed a will after cancer was discovered.

[306]

accounts and before decedent discovered she had cancer) which ostensibly creates a life estate in decedent, thereby enabling her to remain in the house after the mother's death. Further, the services which the mother actually rendered are consistent with the version of the agreement established at trial. These services consisted not only of companionship,[4] but of supervision. Since decedent was not an invalid, she did not require physical care and was able to perform her share of household chores, but she did require her mother's direction. The mother testified she seldom left decedent alone for more than a few hours and virtually directed many aspects of decedent's life, at the same time attempting to make decedent feel as self-reliant as possible. The difficulty in characterizing the range of services contemplated by the parties in part explains some of the discrepancies in plaintiffs' version of the terms of the agreement.

We have reviewed the record and are of the opinion that plaintiffs' various formulations do not render the evidence insufficient to establish that agreement. The agreement was fair in its terms, since decedent's accumulations were made possible by the mother's paying most of the bills, and, under the circumstances, it is reasonable that such a contract would be made by the parties. While both the mother and Mrs. Dannen in their depositions did reply affirmatively to defendant's counsel's question whether the mother was to leave all her property to decedent under the contract, they also testified in depositions that the mother had made a will dividing her property equally among her children. This is borne out by the deeds to the Corvallis home and the Montana property. To the extent contradictions remain, we agree with the trial court that

---

[4] "Companionship" has been recognized in case law as valid consideration not susceptible to pecuniary valuation which will support a contract of this kind. *See, e.g., Tiggelbeck v. Russell, supra,* 187 Or at 569.

found plaintiffs credible.[5] *Jensen v. Miller,* 280 Or 225, 227, 570 P2d 375 (1977); *Clark v. Portland Trust Bank, supra,* 221 Or at 352.

Defendant next contends that the mother's services were not "wholly referable to the contract." This term has never been totally clarified in the case law of Oregon. In *Losey v. O'Hair,* 160 Or 63, 83 P2d 493 (1938), the court refused to enforce an alleged agreement under which plaintiff promised to continue her weekly housekeeping chores for which she was being fully compensated, to care for decedent when he was ill and arrange for his burial in return for which he promised to leave her specific real property. Aside from the fact that only plaintiff testified to the terms of the agreement, the court remarked that the services plaintiff actually rendered were compensated and attributable to the preexisting contract for housecleaning services. Plaintiff was not required by the agreement to forego other employment opportunities or to alter her lifestyle to any great degree. 160 Or at 74-75. *See also Hunter v. Allen,* 174 Or 261, 147 P2d 213, 148 P2d 936 (1944) (services rendered by son entirely attributable to preexisting partnership agreement with mother to manage the family ranch and son did not significantly change course of life by entering into such a partnership).

In *Majovski v. Slavoff,* 188 Or 357, 215 P2d 674 (1950), the court refused to enforce a promise made by decedent on many occasions to leave his house to plaintiffs (children of decedent's friends). The services allegedly required by the contract were for plaintiffs to visit decedent frequently and do "whatever he asked them to." The court remarked that these "services" were the same as those performed by most children

6.

---

[5] Decedent's promise to leave "all her property" to her mother is sufficiently definite under the maxim, "That is certain which can be made so." *Tiggelbeck v. Russell, supra,* 187 Or at 573. The parties clearly contemplated that, if decedent predeceased the mother, decedent's property would consist almost entirely of funds she had accumulated in savings accounts.

and were not attributable to any contract. 188 Or at 373.

In virtually all the cases in the reports in which contracts of this nature have been upheld, it was shown that the occasion for the contract was the express intent of the promisee to move away from the promisor *(Tiggelbeck v. Russell, supra),* or the attempt by the promisor to induce the promisee to come live with him *(Clark v. Portland Trust Bank, supra.)* In such cases, it is clear that the promisee's engagement to render companionship services was attributable to the promise to leave property. In this case, decedent was living with her mother at the time the contract was entered into and her mother was already performing the bulk of the services she promised to continue rendering under the agreement. Defendant does not contend that the support services the mother rendered were insufficient consideration for decedent's promise, only that such services were the product of a familial bond rather than a contract.

We believe the connection between the agreement and the services is sufficient here. In cases involving close friends or relatives, it is unrealistic to assume that the promise to leave "my property" (the extent of which is often uncertain and dependent upon future occurrences) would be sufficient, in the absence of goodwill or familial obligation, to induce a person to abandon career plans and remain with the promisor. *Traver v. Naylor,* 126 Or 193, 268 P 75 (1928) (when plaintiff's fiance was shot, she abandoned her teaching job at his behest and cared for him for nine years until he died). Nor is it fatal that the contemplated services are those which the promisee is already supplying. *Tiggelbeck v. Russell, supra* (plaintiff remained as decedent's roommate); *Vandiver v. Stone,* 149 Or 426, 41 P2d 247 (1935) (plaintiffs' promise to continue caring for decedents sufficiently referable to promise to bequeath farm and operating capital although plaintiffs had performed essentially the same services

before the agreement for which they had been compensated).

The mother testified that, when she took decedent from the institution, it was with the understanding that decedent would live with her mother as long as the mother could provide for her. Since decedent could have continued in the hospital and had sufficient income to defray her own expenses, there was no statutory obligation for her mother to support her. ORS 109.010. By virtue of the agreement, decedent was assured that her mother would not terminate the arrangement and that she would be able to continue to reside in the house even if her mother died. Apparently on the basis of the contract, the mother deeded decedent a life estate in the house. There was ample evidence to show that the mother's lifestyle changed substantially after decedent came to live with her (diminished social activities, greater time demands and giving up encyclopedia selling).

We conclude that an enforceable contract exists in this case. In such cases, equity will grant relief in the nature of specific performance by imposing a constructive trust on property in the hands of third party donees in favor of the promisee. *MacInnes v. Wilson, supra; Popejoy v. Boynton,* 112 Or 646, 654, 229 P 370, 230 P 1016 (1924). Defendant does not contend that the joint account vested in her even if there was a valid and enforceable contract to make a will, but that there was no such contract and if there was one, it failed for lack of consideration.

Finally, once it is determined that a contract existed and that the property in the joint account must go to plaintiffs, there is no basis in law for awarding part of that account to defendant for her trouble in defending the suit. The award of $5,000 to defendant is reversed.

Affirmed in part and reversed in part.