2012 VT 59

# Evelyn O. Mueller v. Juliann H. Mueller, Individually, and as Executrix and Beneficiary of the Estate of Joseph F. Mueller, and/or Trustee and Beneficiary of the Joseph F. Mueller Revocable Trust, et al.

[54 A.3d 168]

No. 11-235

Present: Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.

Opinion Filed July 27, 2012

*Allen C. B. Horsley* of *Barr & Associates, P.C.*, Stowe, for Plaintiff-Appellant.

*Jesse D. Bugbee* of *Kissane Associates*, St. Albans, and *Brad A. Compston* of *Konowitz & Greenberg, P.C.*, Wellesley Hills, Massachusetts, for Defendant-Appellee.

¶ 1. **Dooley, J.** This case derives from a separation agreement made thirty-seven years ago between a now-deceased husband and plaintiff, his first wife. Plaintiff contends that her ex-husband promised to devise to her certain assets upon his death, and she brings various claims for equitable relief against defendant, her ex-husband's second wife, who survived him. The superior court concluded that plaintiff's claims were barred by the statute of limitations. On appeal, plaintiff argues that this conclusion was erroneous because, under the governing Massachusetts law, claims

based on a contract to make a will do not accrue until the promisor's death. Although we accept plaintiff's legal premise, we do not accept that it governs this case. Accordingly, we affirm.

¶ 2. Plaintiff Evelyn Mueller is the first wife of the late Joseph Mueller. The couple was married for thirty-one years, and they had nine children. During their marriage, Joseph was an employee, and at some point the president, of a Massachusetts company called Adolph Bauer, Inc. (ABI). The couple was divorced on September 22, 1975. In July 1976, Joseph married defendant Juliann Mueller.

¶ 3. Evelyn and Joseph's divorce order from the Massachusetts Probate Court was based on — and incorporated — the terms of a separation agreement entered into on August 8, 1975. The current dispute arises out of Article II of the separation agreement, entitled "Support of Wife and Children." The relevant portions of this article read:

> As long as the Wife shall remain unmarried, the Husband shall pay to her during her lifetime as alimony for her support and the support and education of their children, the sum of Four Hundred dollars ($400) per week plus an additional amount sufficient to pay Federal and State income taxes . . . .

> If at any time while Husband is alive, he sells any or all of his stock in Adolph Bauer, Inc., its successors or assigns or any corporation from the partial or complete sale, distribution or liquidation of said assets, Husband agrees that he will include in his will and/or any trust a provision devising all his rights, title and interest in such assets, i.e., Adolph Bauer, Inc., to Evelyn Mueller and, if Wife does not survive Husband, then in equal shares to his surviving children . . . .

¶ 4. In addition, the separation agreement included, among other things, a conveyance of the marital home, and a division of personal property. The agreement also stated, "This agreement is executed in the Commonwealth of Massachusetts and shall be construed to take effect under and in accordance with the laws of said Commonwealth."

¶ 5. In 1983, plaintiff filed a contempt claim in the Massachusetts Probate Court, alleging that Joseph was in violation of the

divorce order — in particular, Article II of the separation agreement — by failing to set up a trust to receive and administer the proceeds of any sale of his ABI stock. Because Joseph was still employed at ABI and he had not sold his ABI stock, the complaint was dismissed without prejudice as premature.

¶ 6. Not long after this suit, however, Joseph did begin the retirement process. On January 30, 1985, Joseph entered into a stock redemption agreement with ABI, in accordance with which he agreed to sell his stock back to the company for a price of $700,128. ABI paid him $50,000 up front with the balance payable in monthly installments of $10,214.49 over eight years (ninety-six months at eleven percent interest). ABI made these monthly payments until it paid off the balance a few months early, in late 1992. When Joseph retired in 1985, he also cashed in a realty trust that he held in connection with property owned by ABI for an estimated payout of $193,000. Additionally, he rolled over his retirement accounts, then worth $218,394.

¶ 7. Sometime in 1984, as Joseph and defendant began the transition into retirement, defendant purchased land in Stowe, Vermont. They built a new home there, which was completed in 1986. Title to the land and house remained solely in defendant's name. The cost of these acquisitions was roughly $350,000, part of which was financed by a mortgage and part of which may have come from proceeds of the ABI stock buyback. The superior court found that Joseph used at least part of the stock sale proceeds for living expenses at some point or another.

¶ 8. After Joseph stopped receiving income from the ABI note in late 1992, he began to claim "financial difficulties" and repeatedly requested that plaintiff agree to a reduction in alimony. In January 1993, Joseph wrote to plaintiff seeking a 29% reduction. In seeking this modification, Joseph explained,

> As of January 1993, the Bauer payments to me came to an end. My income has been reduced by 58% and I will not have sufficient funds to continue the payments to you at the current level.
>
> . . . .
>
> . . . [W]ith-in a year of my retirement, the capital gain tax increased by 13%. This inflated the taxes on the Bauer payments substantially.

¶ 9. In a follow-up letter, Joseph further explained, "[t]he pre-payment by Bauer is ballooning my taxes." The superior court concluded that this exchange would at least have put plaintiff on "inquiry notice" that Joseph may have sold his ABI stock.

¶ 10. Plaintiff never agreed to a reduction, and Joseph continued to pay alimony as agreed. In 2003 and 2004, plaintiff and Joseph again exchanged letters concerning the monthly payments. During this exchange, plaintiff twice described her understanding of the separation agreement. In May 2003, plaintiff stated, "*[A]ll* money from A. Bauer, Inc., was agreed to come to *me* . . . . You should have put it in a trust, immediately, and you could have lived comfortably off the interest." In April 2004, plaintiff again explained,

> According to the terms of the Separation Agreement, the principal of your equity interest in Adolph Bauer was to be either held in trust or outlined in your will *for one sole purpose* only: to assure the continuation of your obligation to me, and in the event of my death to be split among the remaining of our children. The principal was to be used for no other purpose.

Although he replied in writing several times, there is no evidence that Joseph ever commented on plaintiff's description of the applicable provisions in the separation agreement.

¶ 11. Joseph died in December 2007. Under his 2003 will, Joseph left certain personal articles to defendant,[1] a bequest of $1000 to each of eight of his children with plaintiff, and the remainder to a revocable trust created at the same time the will was signed. The will did not mention ABI stock or the proceeds from the sale of ABI stock and left nothing to plaintiff. Joseph never put any ABI stock sale proceeds in trust to hold for plaintiff. The will was never probated because defendant represented that there were no assets of the estate. There were, however, joint accounts with defendant and accounts in which defendant was the named beneficiary so the funds went directly to defendant without going through probate. Defendant put all these funds into the Juliann Mueller revocable trust, which had been created at the time of the signing of Joseph's will in 2003 but

---

[1] If defendant predeceased him, these items were left to the child of Joseph and defendant or to the living issue of the child if he predeceased Joseph.

contained no assets except for ownership of the Stowe home and land. Following Joseph's death, the revocable trust had net assets, excluding the real property, of $392,742. The home and land are estimated to have a value of $550,000, subject to $112,000 in outstanding loans.

¶ 12. Plaintiff brought suit against defendant personally, as trustee and beneficiary of the Juliann Mueller revocable trust, as trustee and beneficiary of the Joseph Mueller revocable trust, and as executrix of Joseph's estate.[2] In essence the complaint alleged that defendant had assets from the sale of the ABI stock and is unjustly enriched by them and that plaintiff is entitled to restitution for "any property which should have been property of Evelyn, but which has been retained by Juliann." The complaint therefore sought various equitable remedies, including declaratory relief, imposition of a constructive trust, and equitable accounting.

¶ 13. After holding a trial, the superior court entered judgment for defendant on two primary grounds and an alternate ground. First, the superior court concluded that the complaint was barred by the statute of limitations. The court reasoned that plaintiff should have known by 1993 that something had happened regarding the ABI stock that implicated her rights under the separation agreement. Because the claims asserted were for equitable relief under Vermont law, the court applied the Vermont statute of limitations. Applying Vermont law, the court held that a cause of action had accrued at that time, and that the suit was required to be commenced within six years therefrom under 12 V.S.A. § 511.

¶ 14. Second, the superior court stated that, even if the statute of limitations did not control, it would reach the same result under the equitable doctrine of laches. The court determined that plaintiff had "no cogent, or persuasive explanation for the delay of 15 years before seeking legal relief in court." This delay, the court reasoned, caused defendant substantial prejudice in that it was now virtually impossible to determine the intentions of the parties in 1975 or to unravel the financial transactions in order to trace the proceeds of the ABI stock sale.

---

[2] The estate was joined in response to defendant's motion to dismiss and the ruling of the superior court of December 18, 2008 that the estate is a necessary party. The amended complaint does not actually assert any claims against the estate, and this case does not directly involve any breach of contract claim against Joseph's estate. There are no funds in the Joseph Mueller revocable trust so the naming of that entity is superfluous.

¶ 15. A central part of the superior court's reasoning on these primary grounds is that the operative language of the separation agreement "is hopelessly ambiguous, and wholly ineffectual in staking out the respective rights of Evelyn and Joseph with respect to the inevitable buyback of his ABI stock." In reaching its statute of limitations decision, the court relied upon extrinsic evidence of the meaning of the language, derived from plaintiff. The court held that plaintiff consistently took the position that Joseph had been required by the separation agreement to sequester the funds from the sale of the stock so the principal remained available to devise to plaintiff or her children in his will. Relying upon that interpretation, the court held that plaintiff was required to bring her action when she knew or should have known that Joseph was dissipating the asset.

¶ 16. As an alternative ground for its decision, the court held that plaintiff failed to trace the proceeds to money held by defendant such that she could recover against defendant on a claim for unjust enrichment. The court held that the complicated nature of the finances of Joseph and defendant "conspire to prevent the court from having any credible basis to unravel the asset skein left to Juliann." The court held "it is nearly impossible on this record to determine, and Defendant is prejudiced by not being able to disprove, whether all, or any part of the current equity value in [Juliann's Stowe property] . . . is in fact traceable, or attributable to the 1985 ABI stock sale." It went on to conclude that "[t]he same essential defect plagues the claim for constructive trust against Defendant's sole remaining investment/money market account." It concluded "it would be an exercise in total speculation" to conclude that defendant was unjustly enriched at plaintiff's expense. Thus, the court stated that "[e]ven if the court were to reach the merits, it does not appear on this record, given the totality of the circumstances, that Evelyn would prevail on her claims of *unjust* enrichment, and for constructive trust, against Juliann."

¶ 17. Plaintiff appeals, challenging both the statute of limitations and laches rulings and the conclusion that the proceeds of the ABI stock sales could not be traced to defendant such that she was unjustly enriched. With respect to the former, plaintiff argues that the court made its ruling based on a theory of anticipatory repudiation, but Massachusetts law, which governs under the contractual law selection clause in the separation agreement, does

not recognize this theory. Thus, plaintiff argues that under Massachusetts law her cause of action did not accrue until Joseph died and she brought the action within the Vermont limitation date based upon that accrual event. With respect to the alternative ruling, plaintiff argues that the evidence was sufficient to show that defendant was unjustly enriched in purchasing the Stowe property and with respect to the funds placed in the Juliann Mueller revocable trust.

■ ¶ 18. A substantial part of the arguments of the parties relates to whether Massachusetts law governs the major issues in this appeal under the terms of the separation agreement. We address this issue first and conclude that the appeal does not turn on which state's law applies. The separation agreement provides that it "shall be construed to take effect under and in accordance with the laws of [Massachusetts]." For purposes of this appeal, we will assume that under the agreement Massachusetts law governs contract construction and when plaintiff's action accrues. See *Stamp Tech, Inc. ex rel. Blair v. Lydall/Thermal Acoustical, Inc.,* 2009 VT 91, ¶ 23, 186 Vt. 369, 987 A.2d 292 ("[I]t is well-settled that it would be contrary to the justified expectations of the parties for a court to interpret their agreement by the laws of any jurisdiction other than that specified in the contract." (citing Restatement (Second) of Conflict of Laws § 187 cmt. c (1971))). Plaintiff agrees that the limitation of action period is controlled by Vermont law and does not contest that the elements of unjust enrichment are supplied by Vermont law.

■ ¶ 19. Upon review of Massachusetts law, we conclude that plaintiff is correct in her assertion that a breach of contract action based upon a contract to make a will does not accrue until the death of the promisor. See *Sliski v. Krol,* 279 N.E.2d 924, 926-27 (Mass. 1972); *Shopneck v. Rosenbloom,* 93 N.E.2d 227, 229 (Mass. 1950); *Tower v. Jenney,* 181 N.E. 123, 124 (Mass. 1932); *Raine v. Shea,* 156 N.E. 541, 541 (Mass. 1927). Although at times the parties implied that this was a peculiarity of Massachusetts law, it seems to be the general view. See, e.g., *Lipe v. Citizens' Bank & Trust Co.,* 178 S.E. 665, 666 (N.C. 1935) ("[T]he cause of action accrues at the time of default, which may arise from abandonment or anticipatory breach, but which usually results from failure to make testamentary provision as promised." (citations omitted)); H. Wood, Annotation, *Remedies During Promisor's Lifetime on Con-*

*tract to Convey or Will Property at Death in Consideration of Support or Services,* 7 A.L.R.2d 1166, § 2 (1949, Supp. 2012); J. King, *Lifetime Remedies for Breach of a Contract to Make a Will,* 50 S.C. L. Rev. 965, 972 (1999) ("Most courts are reluctant to recognize a cause of action during a promisor's lifetime because the promisor has not breached the contract until death and because the promisor cannot be compelled to make a will."). Although this Court has recognized agreements to make a devise, see *Porter v. Everts's Estate,* 81 Vt. 517, 71 A. 722 (1909), we have not addressed this question,[3] but we see no reason why our law would differ from that of Massachusetts.

¶ 20. We come to the same conclusion about the relationship between Massachusetts and Vermont law with respect to contract construction. Under Vermont law, in a dispute over the interpretation of contract language, the first task of the court is to determine whether the language is ambiguous, which is a question of law. See *Isbrandtsen v. N. Branch Corp.,* 150 Vt. 575, 579, 556 A.2d 81, 84 (1988). If the contract language is ambiguous, its interpretation is a question of fact to be determined on all the evidence, including extrinsic evidence, to determine the intent of the contracting parties. See *Dep't of Corr. v. Matrix Health Sys.,* 2008 VT 32, ¶ 12, 183 Vt. 348, 950 A.2d 1201. Massachusetts law is generally the same.[4] See *Bank v. Thermo Elemental, Inc.,* 888 N.E.2d 897, 907 (Mass. 2008).

¶ 21. Determining the source of the law is relevant to our decision only to the extent that the law in question controls part or all of our reasoning. Although plaintiff argues to the contrary, it is clear that the trial court did not find determinative the Massachusetts law on when a contractual right to a devise accrues because the court found that the contract was more than a contract to devise and its language was ambiguous. Thus, it applied the Vermont and Massachusetts law on contract construction, as set out above, but not the law on when a right to a devise accrues. In determining the validity of the trial court decision, we

---

[3] We do not read *Pike v. Pike,* 69 Vt. 535, 38 A. 265 (1897), as addressing this issue.

[4] If there is a significant difference, it lies in our willingness to allow "evidence as to the circumstances under which the conveyance was made" in determining whether the language is ambiguous. See *Isbrandtsen,* 150 Vt. at 580, 556 A.2d at 85. There was no such evidence in this case.

must first determine whether the ambiguity ruling was correct. As we stated above, this ruling is one of law, and therefore our review is de novo. See *O'Connell-Starkey v. Starkey*, 2007 VT 128, ¶ 8, 183 Vt. 10, 944 A.2d 897.

¶ 22. "Ambiguity exists where the disputed language will allow more than one reasonable interpretation." *Id.* There are a number of ways in which the separation agreement language on which plaintiff relies is ambiguous. Read literally, the provision states that if Joseph sells his shares, he is then required to give his interest in *those assets* to plaintiff. But having sold his interest in the assets, he would have nothing to give. Literally, the provision is a promise to give nothing. A second way in which the literal reading of the provision appears implausible is that, on its own terms, the provision applies only if husband sells his ABI shares while he is alive. As long as husband did not sell the shares, he would never be required to give plaintiff any of the assets. Neither of these features of a literal reading makes much sense. Adding a further oddity is the fact that the provision is included as a paragraph tucked within a section entitled "Support of Wife and Children," not within any of the sections discussing the allocation of property. We affirm the trial court's conclusion that the language is ambiguous.

¶ 23. Having found the language ambiguous, the trial court turned to a factual inquiry into the meaning of the language. The evidence was sparse. Both plaintiff and defendant testified, but the testimony provided no significant evidence on the meaning of the agreement.[5] The main evidence was correspondence between

---

[5] Plaintiff was ninety-one years old at the time of the trial and could provide little evidence on the intent of the parties in entering into the separation agreement and the meaning of the agreement.

Defendant provided her understanding of Joseph's position that his obligation was fully discharged by the payment of the alimony under the agreement, but she had no involvement in the drafting of the agreement and left the financial affairs to her husband until he became unable to manage those affairs. Defendant's understanding was based in part on a statement that Joseph put in his 1990 will, which was superseded by the will in effect when he died. The statement in the earlier will was: "In light of the fact that I have sold all of my interest in Adolph Bauer, Inc., pursuant to Article II of the separation agreement dated August 8, 1975, and in light of the fact that I no longer have any 'rights, title and interest in such assets, i.e., Adolph Bauer, Inc.,' all responsibilities that I had, pursuant to Article II of the separation agreement dated August 8, 1975 as amended, between myself and Evelyn O. Mueller have ceased."

plaintiff and Joseph, in which she demanded compliance with her understanding of the agreement, and plaintiff's unsuccessful attempt in 1983 to enforce the agreement with respect to the ABI stock in the Massachusetts Probate Court.

¶ 24. Rather than resolving the contract construction issue as a matter of fact, the court reasoned that under plaintiff's position as to Joseph's obligation under the agreement her cause of action accrued when the agreement was made between ABI and Joseph for him to sell the stock. The court held that "it is ultimately unnecessary . . . to declare what the provision appears to mean, or try to divine what the parties really intended in 1975" because plaintiff's claim would fail even "*if,* as she apparently thought and still contends, any such sale required Joseph to immediately put all the proceeds into an irrevocable trust (under which he could not touch any of the principal) to guarantee her alimony payments, and then pay the principal all to her (or to their children if she died before him)." Thus, the court's logic was that since plaintiff alleged that Joseph's breach of the agreement was the failure to establish the trust, and not the failure to put the devise of the proceeds in the will, she was not relying on a theory of anticipatory repudiation and the cause of action would accrue when Joseph failed to establish the trust.

¶ 25. As discussed in more detail below, this is fundamentally an unjust enrichment action. While plaintiff's complaint alleges that the two personal revocable trusts, one for Juliann and one for Joseph, held money that should have gone to plaintiff, and that a constructive trust should be imposed, there is no allegation that Joseph should have established an irrevocable trust for the ABI stock sale proceeds at the time he began to receive them. Some of the evidence supported the court's view that plaintiff had sought an irrevocable trust. In the 1983 enforcement action in the Massachusetts Probate Court, the complaint alleged that Joseph "[h]as failed to set up [a] trust in accordance with the last paragraph appearing on page 3 of [the] Separation Agreement." Plaintiff's affidavit in this case described the contempt action by stating, "my counsel filed a complaint for contempt claiming that Joseph had failed to establish a trust pursuant to Article II of the [Separation] Agreement." In a letter in 2003, plaintiff wrote, "You should have put it in a trust, immediately, and you could have lived comfortably off the *interest.*" Other evidence was more equivocal. For example, plaintiff's letter of April 2004 to Joseph

stated that the proceeds should "be either held in trust or outlined in your will." Plaintiff testified that the ABI stock was to come to her "not just when he sold it but if he died." Plaintiff's position in this Court, consistent with her position below, was that the Agreement required that the proceeds of the ABI stock were to be devised to her, or her children, on Joseph's death irrespective of whether he sequestered them as they came to him.

¶ 26. We acknowledge that the court could have found that the separation agreement contained a requirement to sequester the ABI stock sale proceeds although it was not explicit on this point. But the court made no such finding. We do not believe it could substitute for such a finding a disputed assertion of plaintiff's position, attributing to plaintiff a waiver of any alternative position. We therefore cannot affirm the court's statute of limitations holding.

¶ 27. This brings us to the court's alternative holding — that plaintiff's action fails because she did not trace the proceeds of the stock sale into the funds held by defendant on which she seeks to impose a constructive trust. As we noted above, this is not a breach of contract action against Joseph or his estate, nor is it a contempt action based on the divorce order. At its core, plaintiff's allegation is that defendant was unjustly enriched by the receipt of some or all of the proceeds of the stock sale. Plaintiff identifies two ways in which defendant was unjustly enriched — in the purchase of the land for and construction of the house in Stowe, and in the funds that came to her outside probate on Joseph's death. As a remedy, she seeks a constructive trust for her benefit on the house and land, and on the Juliann Mueller revocable trust.

¶ 28. Under the doctrine of unjust enrichment, "a party who receives a benefit must return [it] if retention would be inequitable." *Gallipo v. City of Rutland*, 2005 VT 83, ¶ 41, 178 Vt. 244, 882 A.2d 1177. Unjust enrichment is present if, " 'in light of the totality of the circumstances, equity and good conscience demand' that the benefitted party return that which was given." *Id.* (quoting *Brookside Memorials, Inc. v. Barre City*, 167 Vt. 558, 560, 702 A.2d 47, 50 (1997) (mem.)). Whether there is unjust enrichment present " 'may not be determined from a limited inquiry confined to an isolated transaction. It must be a realistic determination based on a broad view of the human setting

involved.'" *Legault v. Legault*, 142 Vt. 525, 531, 459 A.2d 980, 984 (1983) (quoting *McGrath v. Hilding*, 363 N.E.2d 328, 331 (N.Y. 1977)).

¶ 29. The common remedy for unjust enrichment is imposition of a constructive trust, where the person with the legal title "cannot enjoy the beneficial interest without violating the rules of honesty and fair dealing."[6] *McGann v. Capital Sav. Bank & Trust Co.*, 117 Vt. 179, 189, 89 A.2d 123, 130 (1952). Imposition of a constructive trust is a common remedy in a case where property or funds have been diverted to a third person in violation of the terms of a contract to make a specific devise. See *Goldstein v. Hoffman*, 29 Cal. Rptr. 334, 340 (Ct. App. 1963); *Allen v. Mayo*, 279 N.W.2d 617, 620 (Neb. 1979). Plaintiff sought a constructive trust here.

¶ 30. Plaintiff's theory with respect to defendant's house is that defendant was able to construct it and pay off the mortgage only through the use of proceeds of the ABI stock sale.[7] Therefore, plaintiff argues, defendant should be able to keep the house and land only if she pays back to plaintiff the stock sale proceeds that were diverted to the house. Plaintiff argues that defendant was enriched by the stock sale proceeds and that enrichment became unjust when Joseph failed to devise the stock sale proceeds to plaintiff.

¶ 31. The difficulty with plaintiff's position with respect to the house is that plaintiff had the burden of tracing the stock sale proceeds into the house to enable their return. Defendant's testimony was that none of the proceeds went into the purchase of the land or the construction of the house although an undetermined amount may have gone into payments on the mortgage. Plaintiff was unable to refute this testimony or show how much went into the mortgage payments. The trial court found: "Thus it

---

[6] We noted in *Gregoire v. Gregoire* the trend to require proof of entitlement to a constructive trust by clear and convincing evidence. 2009 VT 87, ¶ 13, 186 Vt. 322, 987 A.2d 909. We did not decide whether to follow that practice in *Gregoire*. Similarly, we see no need to decide the question here.

[7] We analyze this argument, as the trial court did, assuming its validity but holding that plaintiff failed to supply the requisite proof. We note, however, that this argument is arguably inconsistent with plaintiff's position that Joseph had no responsibility to sequester the proceeds of the ABI stock sales and his only responsibility arose with respect to his will. Under this theory, the use of stock sales proceeds to construct the house appears to be irrelevant.

is nearly impossible on this record to determine, and Defendant is prejudiced by not being able to disprove, whether all, or any part of the current equity value in the [Stowe property] is in fact traceable, or attributable to the 1985 ABI stock sale." Based on our review of the record, we would substitute "impossible" for "nearly impossible."

¶ 32. Plaintiff's argument presumes that if she can trace any proceeds to the home, she is entitled to a constructive trust for its entire value. We conclude that she had the burden to trace not only the fact that stock sale proceeds went into the value of the house but also the amount of those proceeds. With such a showing the appropriate remedy might be a lien to the extent of the value reflecting the proceeds. As the trial court found, plaintiff could not produce a record that made tracing possible. See *Sheldon v Sheldon*, 987 P.2d 1229, 1235-36 (Or. Ct. App. 1999) (explaining the potential appropriateness of a lien but refusing to grant it where plaintiff failed to trace the source of funds). Accordingly, the trial court properly declined a remedy with respect to the house and land.

¶ 33. The claim that the court should have imposed a constructive trust in plaintiff's favor over the content of the Juliann Mueller revocable trust presents a closer question. We would concur with plaintiff that if Joseph had devised property or money directly to Juliann, plaintiff would potentially be entitled to a constructive trust on the property or funds. There is no question that in such circumstances, assuming plaintiff's interpretation of the agreement, Juliann's enrichment would be unjust. See *Brooks v. Yarbrough*, 37 F.2d 527, 532 (10th Cir. 1930) (collecting cases); *Musselman v. Mitchell*, 611 P.2d 675, 681 (Or. Ct. App. 1980). Beyond that, if Joseph made a gift of property or money to Juliann right before his death, leaving his estate unfunded or with inadequate funds to fulfill his contractual commitment, plaintiff would be entitled to a constructive trust over the property or money transferred up to the value of the contractual commitment. See *Murphy v. Glenn*, 964 P.2d 581, 586-87 (Colo. App. 1998); *In re Estate of Hodgson*, No. 55741-6-I, 2006 WL 1135035, at *9 (Wash. Ct. App. May 1, 2006). See generally 1 Page on the Law of Wills § 10.23 (rev. ed. 2003). Again, Juliann's enrichment would be unjust.

¶ 34. Plaintiff argues that the latter hypothetical is what occurred here, with the factual variation that the funds came to

Juliann outside the probate estate through the vehicle of a joint account. In an affidavit submitted by Juliann, and made an exhibit in the trial, she stated that after Joseph's death, she transferred a brokerage account that had previously been a joint account into the Juliann Mueller revocable trust. She stated that there were no other assets in the trust except her Stowe home. Thus, plaintiff in her post-trial memorandum argued that Juliann had transferred the $397,000 into the revocable trust from the joint account and a constructive trust should be imposed on the whole value of the revocable trust.

¶ 35. Defendant accepts that the money came from a joint account, but there is no evidence of the source of the money to that account. For all that appears, it may have come at least in part from defendant's earnings from her part-time work or from her Social Security benefits. She is not enriched by retaining those funds, and the retention is not unjust. We agree that the evidence shows that it is highly likely that some of those funds came from Joseph. But we do not believe that likelihood is sufficient for plaintiff to meet her burden of proof. She had to show the source of the funds so that the court could allocate between amounts that should answer to plaintiff's claim and those that should not. As it properly did, the trial court had to conclude that plaintiff failed to meet her burden. We affirm that conclusion.

*Affirmed.*